**Phillip D. HALLFORD Petitioner,**

v.

**Grantt CULLIVER, Warden, Respondent.**

**No. CIV.A. 1:95CV1413C.**

United States District Court, M.D. Alabama, Southern Division.

Dec. 15, 2004.

---

Andrew E. Kantra, Andrew R. Rogoff, Eric T. Scott, Richard S. Schlegel, Pepper Hamilton LLP, Philadelphia, PA, William Rives Blanchard, Jr., Blanchard and Associates LLC, Montgomery, AL, for Petitioner.

James Clayton Crenshaw, Office of the Attorney General, Montgomery, AL, for Respondent.

## MEMORANDUM OPINION

COODY, Chief United States Magistrate Judge.

### I. INTRODUCTION

On November 1, 1995, the Petitioner, Phillip Hallford, an Alabama inmate under sentence of death, filed a petition [1] in this court seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. In its answer to the petition, the State of Alabama responded that many of the claims raised by Hallford were precluded from review because they were procedurally defaulted. On June 11, 1999, the court directed that this case proceed in two stages, the first of which was to determine which claims should be denied on procedural default grounds and which non-defaulted claims required an evidentiary hearing. The second stage would then determine the merits of the non-defaulted claims. The determination of stage I issues was referred to the undersigned. After the determination of the stage I issues,[2] the parties on May 21, 2002, pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment. On May 23, 2002 this case was reassigned to the undersigned for dispositive resolution.

Following an evidentiary hearing on two of Hallford's claims, the court received and has carefully considered the briefs from both Hallford and the State. Based on the arguments of the parties, the record, and all of the evidence, the court, after exhaustive consideration of all Hallford's claims,

1. Motions to Amend the Petition for Writ of Habeas Corpus were granted on January 11, 2002, and on December 5, 2002.

2. A Recommendation was entered on March 13, 2000, and a Supplemental Recommenda-

tion was entered on August 27, 2001. On April 12, 2002, the court adopted both the Recommendation and the Supplemental Recommendation.

concludes that Hallford's petition is due to be denied in all respects.

## A. *FACTS*

On March 4, 1987, Hallford was convicted of the capital offense of murder committed in the course of a robbery. *See* ALA. CODE § 13A–5–40(a)(2). The Alabama Court of Criminal Appeals summarized the facts of the case as follows:

> The state's evidence at the guilt phase of [Hallford's] trial tended to show that in the early morning of April 13, 1986, [Hallford] forced his daughter [Melinda] to entice her boyfriend, Charles Eddie Shannon to a secluded bridge. He then shot Shannon once in the roof of the mouth. While Shannon was still alive, [Hallford] dragged him to the side of the bridge and shot him two more times, once in the front of the left ear and once in the forehead. [Hallford] then threw the body over the bridge railing and into the water.

> Sometime after the shooting, [Hallford] returned to the scene of the crime to remove the blood from the bridge. The next day [Hallford] burned the victim's wallet and its contents. These events were witnessed in part by [Hallford's] daughter and his son, who testified against him at trial. While [Hallford] was burning the victim's wallet he commented that the victim was a "cheapskate" because he said he found no money in the wallet. However, the victim's father testified that he had given the victim money on the afternoon of his disappearance. The victim's badly decomposed body was discovered in the water approximately two weeks after the shooting.

> [Hallford] maintained at trial that he did not kill the victim and that he was nowhere near the bridge when the murder occurred.

*Hallford v. State,* 629 So.2d 6, 7 (Ala.Crim. App.1992).

After finding Hallford guilty of the capital offense of murder committed in the course of a robbery, the jury, by a vote of 10–2, returned a verdict recommending that Hallford receive the death penalty. On April 16, 1987, following a hearing, the trial court sentenced him to death. Hallford's conviction and death sentence were affirmed on direct appeal. *Hallford v. State,* 548 So.2d 526 (Ala.Crim.App.1988), *aff'd,* 548 So.2d 547 (Ala.) *cert. denied,* 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).

Hallford filed pursuant to ALA. R.CRIM.P. 32 a motion for state post-conviction relief, and a hearing was conducted by the trial court (hereinafter "Rule 32 hearing"). Post-conviction relief was denied; the denial was affirmed by the Alabama Court of Criminal Appeals. *Hallford v. State,* 629 So.2d 6 (Ala.Crim. App.1992), *cert. quashed,* No. 1920735, 1993 Ala. LEXIS 1420 (Ala. Dec. 10, 1993), *cert. denied,* 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994). This is the first petition for federal habeas corpus relief filed by Hallford.

## B. *GENERAL STATEMENT OF THE LAW*

A district court must resolve all claims for relief raised in a petition for writ of habeas corpus. *Clisby v. Jones,* 960 F.2d 925, 936 (11th Cir.1992). Because Hallford filed his habeas corpus petition on November 1, 1995, before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this case is governed by pre-AEDPA law. *See Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under pre-AEDPA law the state court's findings of fact are entitled to a presumption of correctness. To overcome this presumption, the peti-

tioner must show with clear and convincing evidence that the state court's finding was not "fairly supported by the record." *See Johnson v. Alabama,* 256 F.3d 1156, 1169 (11th Cir.2001). Questions of federal law or mixed questions of law and fact, however, are not subject to the presumption. *Hardwick v. Crosby,* 320 F.3d 1127, 1159 (11th Cir.2003). There are numerous claims contained in Hallford's habeas petition which are properly before the court for a determination on their merits. However, before the court reaches the merits of these claims, the court must address a preliminary question of whether Hallford's *Brady v. Maryland*[3] claim is barred from review. The essence of this claim is that the prosecution failed to disclose to Hallford that his daughter, a key witness, was offered lenient treatment in her criminal case in exchange for her testimony against Hallford.

## II. WHETHER THE BRADY CLAIM IS PROCEDURALLY DEFAULTED

### A. THE DOCTRINE OF PROCEDURAL DEFAULT

As explained below, Hallford's *Brady* claim relating to the suppression of impeaching evidence is procedurally defaulted. The procedural default doctrine ensures that "state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." *Picard v. Connor,* 404 U.S. 270, 276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). In *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Court held that a federal court's consideration of the merits of a claim in a petition for habeas corpus can be barred by the petitioner's failure to comply with state proce-

dural rules, unless the petitioner makes a showing of cause for the failure and prejudice resulting from the failure. Under the doctrine of procedural default, claims which have never been presented to a state court or claims which were not fully exhausted in state courts are procedurally defaulted if presentation of the claims in state court would be barred by state procedural rules. *Collier v. Jones,* 910 F.2d 770 (11th Cir.1990). This court may consider Hallford's procedurally defaulted claims on the merits only if he shows either (1) cause for the procedural default and actual prejudice arising out of the violation of federal law, *Wainwright,* 433 U.S. at 87, 97 S.Ct. 2497, or (2) a resulting fundamental miscarriage of justice if the court does not consider the claims. *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

To demonstrate cause for a procedural default, a habeas petitioner must establish that some objective factor external to the defense impeded his efforts to raise the claim in state court and that this failure cannot be fairly attributable to his own conduct. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Examples of objective factors external to the defense that constitute cause include interference by officials and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *Id.*

To demonstrate prejudice, a habeas petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71

---

**3.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court decided at the stage I proceedings that it should

hold a cause and prejudice hearing to determine if there were grounds to excuse the default of Hallford's *Brady* claim.

L.Ed.2d 816 (1982); *Johnson v. Alabama*, 256 F.3d at 1171. Prejudice in the context of a *Brady* claim about undisclosed information means that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed ... [information] had been disclosed to the defense." *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), *quoting Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

### B. FACTS PERTAINING TO THE BRADY CLAIM

#### 1. *Procedural History of the Brady Claim*

■ At Hallford's trial, his daughter Melinda gave damaging testimony describing how Hallford got her to entice the victim to come to the bridge and how Hallford killed him. Hallford claims in this court that the prosecution violated the duty imposed by *Brady v. Maryland* by suppressing evidence that his daughter Melinda agreed to testify against him only in exchange for lenient treatment related to her involvement in the murder.[4] In his state post-conviction petition filed on October 4, 1990, Hallford made the following general, as well as obviously speculative, *Brady* claim:

Claim X.

Due Process requires the prosecution to disclose to the defense any and all evidence that is favorable to the accused and material either to guilt or punish-

**4.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), established that a prosecutor has a duty to provide a criminal defendant with all evidence materially favorable to the defendant's defense. This duty extends to evidence relating to the credibility of a witness when the defendant's guilt or innocence may turn on that witness's credibility. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). A prosecutor has a duty to disclose evidence of any prom-

ment. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Hallford requires an evidentiary hearing in order to discover whether any exculpatory evidence which should have been disclosed to him was withheld.

R. Ex. P–90 at p. 47. During the post-conviction proceeding, Hallford never amended this general *Brady* claim to allege a claim containing the factual allegations set forth in the federal habeas petition now before this court. On appeal from denial of Rule 32 relief, Hallford failed to raise any *Brady* claim in his brief filed in the Alabama Court of Criminal Appeals.

In this case, Hallford makes the following fact specific *Brady* claim:

H. Hallford's Rights Guaranteed By the Sixth, Eighth And Fourteenth Amendments To The United States Constitution Were Violated By Alabama's Suppression of Material Evidence.

1. Failure to Disclose Promises Made to a Material Witness in Exchange for her Testimony.[5]

143. Due Process requires the prosecution to disclose to the defense any and all evidence of promises made by the state to a witness in exchange for her testimony. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (citing *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)).

ises made to a prosecution witness in exchange for that witness's testimony. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

**5.** The Petition contains a second part to this *Brady* claim concerning investigator Walter Ford's notes. However, Hallford does not address this claim in his brief filed with this court. Thus, the court concludes that this portion of the *Brady* claim is abandoned.

144. Melinda was charged with and pleaded guilty to charges of Criminally Negligent Homicide in the Juvenile Division of the District Court of Dale County, Alabama, for acts arising out of the same series of events that Alabama alleges resulted in [the] {sic} death of Shannon, the events for which Hallford has been convicted of capital murder and sentenced to die. Melinda was committed to the custody of the Alabama Department of Youth Services for one year.

145. Before entering a plea of guilty to the charges of criminally negligent homicide, Melinda had insisted that she and her father had nothing to do with Shannon's death. (Trial Exhibits D–2 and D–3; *see* SE1496–SE1497; SE 1498).

146. Melinda has stated that Walter Ford, the Dale County Sheriff's chief investigator of the murder of which Hallford was convicted, threatened her with time in prison if she did not provide information about Eddie Shannon's death. (Trial Exhibit D–3; *see* SE1498).

147. On information and belief, Melinda was released from the custody of the Alabama Department of Youth Services after serving only six weeks of her one year commitment.

148. On information and belief, Melinda agreed to testify against Hallford after receiving a promise of favorable treatment with respect to her adjudication on the charge of Criminally Negligent Homicide.

149. Melinda provided critical testimony against Hallford at the guilt and penalty phases of his trial. *See* Paragraphs 135–36, *supra*.

150. Hallford requires discovery and an evidentiary hearing to substantiate his claim that the State failed to disclose evidence of promises made to a material witness in exchange for her testimony.

This claim has not been amended. In its April 12, 2002 Memorandum Opinion and Order, this court concluded that this *Brady* claim is procedurally defaulted because it was abandoned in the appeal from the Rule 32 proceedings in state court. The court, however, further concluded that Hallford was entitled to an opportunity to present evidence to establish cause and prejudice for this default. On December 3, 2002, this court held a hearing on the cause and prejudice questions pertaining to the *Brady* claim and on the merits of the *Brady* claim itself.

2. *Facts Concerning the Deal with Melinda Hallford*

Hallford's *Brady* claim revolves around an agreement the prosecution made with Melinda Hallford in exchange for her testimony against her father about Eddie Shannon's murder. On May 16, 1986, Walter Ford, the lead investigator of Shannon's death, secured an arrest warrant for Hallford and a juvenile petition regarding Melinda, which alleged that Hallford and Melinda "did intentionally cause the death of another person, Charles E. Shannon, by shooting him with a pistol, in violation of Title 13A–6–2 of the Code of Alabama." R. Ev.Hr'g. Pet'rs. Ex. D (Juvenile Petition.) On May 23, 1986, Hallford and Melinda were arrested. R. Ex. P–2 at 356–361. At that time, Ford attempted to interview Melinda, but she refused to speak to him. R. Ex. P–2 at 141–42, 326. The evidence adduced at trial shows that prior to her arrest Melinda was reluctant to provide information to Ford. Indeed, when Ford interviewed Melinda on May 2, 1986, prior to the execution of the arrest warrant and the juvenile petition, she denied calling Shannon to ask him to come to the bridge, having sexual contact with Shannon, or being with Shannon at the bridge where he was killed. R. Ex. P–94 at 251, 254–256.

William Matthews, Jr., who was then an Assistant District Attorney, handled the State's case against Melinda. Ev. Hr'g Tr. at 13, 15. Matthews testified at the evidentiary hearing held in this court that he intended to certify Melinda as an adult and prosecute her for intentional murder if she did not agree to testify against Hallford. *Id.* at 16–18. Shortly before the juvenile court held a hearing on Melinda's petition, Matthews learned from Ford and Melinda's attorney, Robert G. Robinson, that a plea agreement had been reached with Melinda, and Matthews approved the agreement. *Id.* at 16–18, 20.[6] Matthews further testified that if Melinda had failed to testify against Hallford, the plea agreement contemplated that the State could move to revoke her guilty plea in juvenile court and charge her with murder as an adult. *Id.* at 19, 48. Robinson testified similarly that "I am certain that the reason [Melinda] was allowed to stay in the juvenile system was her promise to testify as she did." *Id.* at 53. If Melinda had not agreed to testify, Robinson understood that the State "would have proceeded on to have her certified as an adult and tried her for murder." *Id.* This agreement, however, was never memorialized in writing in any way. *Id.*

Matthews left office in January 1987, approximately two months before Hallford's trial. Ev. Hr'g Tr. at 14, 38. Neither Matthews nor Robinson told David Emery, the newly elected District Attorney who ultimately tried Hallford for capital murder, or anyone in Emery's office that Melinda had agreed to testify against Hallford pursuant to a plea agreement that allowed her to avoid being tried on intentional murder charges as an adult. *Id.* at 22, 55–56. Emery denied the existence of any deal with Melinda, but acknowledged

that he did not ask Matthews about how the charges against Melinda or Hallford had been handled, and that he was not in office when Melinda's plea agreement was negotiated, explaining, therefore, why he did not know if a deal had been made. *Id.* at 172–73, 175, 183.

On June 25, 1986, Melinda pleaded guilty to juvenile delinquency based on a charge of criminally negligent homicide for her involvement with Shannon's death. Ev. Hr'g. Pet'rs Ex. D (Decree of Judgment). Criminally negligent homicide is a Class A misdemeanor punishable by imprisonment for not more than one year. ALA. CODE §§ 13A-6-4, 13A-5-7. Although Melinda was committed to the custody of the Alabama Department of Youth Services for one year, she was released to her mother after only five weeks in custody. Ev. Hr'g. Pet'rs. Ex. D (Aftercare Order).

### 3. *Requests for Brady Information*

Seven months before Hallford's trial, Bill Kominos, Hallford's trial counsel, filed a motion requesting that the State "provide the Defendant with all exculpatory or otherwise favorable information or evidence as provided by *Brady v. Maryland*." Ev. Hr'g. Pet'rs. Ex. A¶1; Ev. Hr'g. Tr. at 79–80. About a week before Hallford's trial, Kominos and David Emery, the District Attorney, had a pretrial conference with the trial judge. Kominos sought the court's assistance in ensuring that he had all information he was entitled to receive before trial, including any *Brady* material. *Id.* at 80–82, 83 S.Ct. 1194. In the presence of Kominos and Emery, the trial judge "flipped through" Emery's file and instructed Emery to make copies of a "few things." *Id.* at 82–83, 83 S.Ct. 1194. The

---

**6.** Ford's involvement in securing plea agreements was apparently a common practice in this Alabama county.

materials Kominos received made no reference to any plea agreement with Melinda. *Id.* at 83, 182–83, 83 S.Ct. 1194. In spite of Kominos' pretrial requests for *Brady* information, no evidence of Melinda's deal was disclosed prior to Hallford's trial.

At Hallford's trial, Kominos asked Walter Ford, "Did you ever tell Melinda that she could possibly go to jail for her involvement in this case?" Ford replied, "Yes, sir." Kominos then asked "Did you ever tell Melinda that if she told the truth and she cooperated that she would not go to jail?" Ford replied, "No sir." Finally, he asked "Did you ever tell Melinda to help you put Phillip Hallford away?" Ford replied, "No, sir." R. Ex. P–3 at 566. Thus, the jury heard no testimony during either the guilt or penalty phases of Hallford's trial that Melinda was testifying pursuant to a plea agreement or that Melinda had originally been charged with the intentional murder of Shannon.

In November 1990, during the state post-conviction proceeding, Hallford's Rule 32 counsel filed a motion for discovery, requesting all information and material to which Hallford was entitled under *Brady*. Ev. Hr'g Pet'rs Ex. B at 1, 2, 5. In its response, the State failed to disclose Melinda's plea agreement. Ev. Hr'g Pet'rs Ex. C; Ev. Hr'g Tr. at 113–14. In December 1990, Rule 32 counsel inquired again about his *Brady* requests. Ev. Hr'g Tr. at 114–15. At a meeting of counsel during a status conference, the District Attorney responded that all *Brady* information had already been disclosed to Hallford's trial counsel.[7] *Id.* at 115–116. In April 1991, Rule 32 counsel reviewed the files of the Alabama Attorney General, District Attor-

ney Emery who prosecuted Hallford, and the Dale County Sheriff's Department. *Id.* at 140, 147–48. During this review, the State advised Rule 32 counsel that all information relevant to Hallford's case had been disclosed. *Id.* On the last day of Hallford's Rule 32 hearing, Hallford received Melinda's juvenile court records pursuant to a subpoena served on state agencies. Pet'rs. Ev. Hr'g. Ex. D; Ev. Hr'g Tr. at 120, 129–30, 142. Rule 32 counsel moved them into evidence over the State's objection on the basis of relevancy. Ev. Hr'g Tr. at 129, 131–32, 144–45; Ex. P–92 at 427.

### 4. *The Juvenile Court File*

Nothing in the juvenile court records disclosed that Melinda's testimony was obtained in exchange for the State's agreement not to certify her as an adult and prosecute her for intentional murder. Ev. Hr'g Pet'rs Ex. D; Ev. Hr'g Tr. at 130–131, 143–44. The juvenile court file did indicate that Walter Ford executed a juvenile petition on Melinda alleging that she and Hallford "did intentionally cause the death of another person, Charles E. Shannon, by shooting him with a pistol, in violation of Title 12A–6–2." Ev. Hr'g Rsp Ex. 1. These records further show that about a month later, a Dale County District Judge entered a decree confirming that Melinda pleaded guilty to juvenile delinquency based on the lesser offense of criminally negligent homicide. Ev. Hr'g. Rsp. Ex. 11. The file also made reference several times to R.G. Robison, Melinda's lawyer, who lived in Dale County where the state post-conviction proceedings were

---

**7.** There is some question about the factual correctness of Rule 32 counsel's testimony as to Emery's representation at this meeting. Indeed, Rule 32 counsel Richard Schlegel testified that Emery and others were present at this meeting where Emery allegedly told them that the state had produced everything. Ev.

Hr'g. Tr.114–116. However, Emery testified that he had no involvement in the Rule 32 proceeding, that it was handled by the Attorney General's office, and that he had never seen Schlegel before. Ev. Hr'g. Tr. 182. It is not necessary for the court to resolve this conflict.

pending. He was, however, never contacted by Hallford's Rule 32 counsel. Ev. Hr'g Tr. at 65, 137, 164–65. The file also refers to Chief Deputy Walter Ford who played a substantial role in negotiating the agreement with Melinda. Ev. Hr'g Tr. at 15–18, 29, 37, 44–45, 51–53. There is no evidence that Rule 32 counsel sought to interview Ford. Rule 32 counsel also failed to contact William Matthews, the District Attorney who approved the plea agreement.[8] Ev. Hr'g. Tr. at 127–28, 164. Matthews testified at the evidentiary hearing before this court that he practiced law in Ozark, Alabama at the time the Rule 32 proceedings were pending and that he would have discussed Melinda's case with Rule 32 counsel, but was never contacted. Ev. Hr'g. Tr. at 38.

### 5. *Melinda's Testimony Against Hallford*

During the guilt phase of Hallford's trial, Melinda gave an eyewitness account implicating Hallford in the shooting death of Shannon and testified that Hallford burned Shannon's wallet the day after the shooting. R. Ex. P–2 at 464–79. Melinda was the only witness the State called during the penalty phase of Hallford's trial. R. Ex. P–7 at 717–20. She testified that she had a sexual relationship with Hallford when she was seven or eight years old, that she had a sexual relationship with Hallford in 1985 that included sexual inter-

course, and that Hallford did not want her to see Shannon. *Id.* at 718–20.

### C. DISCUSSION OF PROCEDURAL DEFAULT OF BRADY CLAIM

#### 1. *The Cause Inquiry*

It is undisputed that the State failed to disclose evidence of Melinda Hallford's deal even after the requests from Hallford's trial and Rule 32 counsel.[9] Hallford argues that this suppression constitutes "some objective factor external to the defense [which] impeded counsel's effort to comply with the State's procedural rule." *Strickler*, 527 U.S. at 283 n. 24, 119 S.Ct. 1936. Furthermore, Hallford argues that, as in *Strickler*, it was reasonable for his defense counsel to rely on the prosecutor to fully perform his duty to disclose all exculpatory materials. *Id.* at 284, 119 S.Ct. 1936. Likewise, Hallford argues that it was reasonable for his defense counsel to rely on the representation that all existing exculpatory materials were included in the open files tendered by the prosecution. *Id.*

As noted above, Hallford's Rule 32 counsel included a general *Brady* claim in the Rule 32 petition. During the evidentiary hearing before the Rule 32 court, counsel received Melinda's juvenile court file and admitted it into evidence. Counsel then failed to include any *Brady* claim in his brief on appeal to the Alabama Court of

---

**8.** Matthews' name does not appear in the juvenile court file. However, based upon the facts presented at the evidentiary hearing before this court, it is certain through conversations with Ford or Robison, whose names were in the file, that Rule 32 counsel could have identified Matthews.

**9.** There is no evidence of an intentional failure to disclose the information about the deal with Melinda. The District Attorney who tried the case, David Emery, had no knowledge of the deal because he was not in office

when the deal was approved by the William Matthews, who was the assistant District Attorney at that time. These facts, however, do not absolve the State of its *Brady* obligation. *See Strickler*, at 281, 119 S.Ct. 1936 *quoting Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). ("[t]o comply with *Brady* ... 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' ")

Criminal Appeals. At the evidentiary hearing before this court, Hallford's counsel testified that they did not assert a *Brady* claim on appeal from the Rule 32 proceeding because the juvenile court file documents themselves did not say there was any deal, and there were representations made throughout the proceedings that all *Brady* information had been provided. Ev. Hr'g Tr. at 130–131.

Respondents argue, however, that Hallford's counsel had the tools available to them to present a *Brady* claim. The respondents rely on the contents of the juvenile court file including the juvenile petition executed by Walter Ford on Melinda alleging that she and Hallford intentionally murdered Shannon and the judicial decree showing that Melinda pleaded guilty to the lesser offense of criminally negligent homicide. Ev. Hr'g. Rsp. Ex. 11. The respondents argue that while these documents do not on their face demonstrate the existence of a deal, they do demonstrate that Melinda plead guilty to a far less serious offense than the original charge, and they contain the names [10] of individuals who had information about the juvenile proceedings and the undisclosed deal. Respondents argue that through minimal investigation counsel could have discovered the factual basis for a *Brady* claim and, therefore, contend that Hallford cannot demonstrate cause for his default.

Whether Hallford has established cause for his procedural default of his *Brady* claim is governed by *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) and *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In *Kyles*,

the Court considered a defaulted *Brady* claim concerning evidence favorable to the defendant which was never disclosed by the prosecution. Initially, the Court emphasized that a "showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more." *Id.* at 437, 115 S.Ct. 1555.

> We have never held that the Constitution demands an open file policy (however such a policy might work out in practice), and the rule in *Bagley* [11] (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate.
>
> *Id.*

However, the *Kyles* Court definitively assigns to the prosecution two salient duties for *Brady* purposes. First, the prosecutor must "gauge the likely net effect of all … evidence [favorable to and unknown by the defense] and make disclosure when the point of 'reasonable probability' is reached" *Id.* A "reasonable probability" is a probability "that, had the evidence been disclosed to the defense, the results of the proceeding would have been different." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. Second, an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437, 115 S.Ct. 1555.

> [N]o one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that "procedures and reg-

---

10. The names of Walter Ford, the chief investigator for the State on the Hallford case, and R.G. Robison, Melinda's lawyer in the juvenile proceedings, were plainly included in the petition and the decree.

11. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

ulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

\* \* \* \* \* \*

Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result.

*Kyles*, 514 U.S. at 438–439, 115 S.Ct. 1555.

In *Strickler v. Greene, supra*, the Court reiterated that mere nondisclosure is not a *Brady* violation and clarified the nature of a *Brady* violation.

[T]here is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

527 U.S. at 281–282, 119 S.Ct. 1936.

For analytical purposes, it is the facts of *Strickler* which are important in Hallford's case. Strickler was convicted of abduction, robbery and capital murder and was sentenced to death. A key prosecution witness at trial was Ann Stoltzfus, an eye witness to the victim's abduction. Not until the federal habeas court ordered the production of all police and prosecution files did Strickler learn of documents that impeached significant parts of Stoltzfus'

testimony. Strickler freely acknowledged that his *Brady* claim was defaulted because it was never raised in state court. *Id.* at 282, 119 S.Ct. 1936. The state argued Strickler could not demonstrate cause for the default because the claim could have been raised in state collateral proceedings "through the exercise of due diligence, but was not." *Id.* at 283, 119 S.Ct. 1936. Notably, even though the prosecutor maintained an "open file" policy, the favorable evidence was not included in the prosecutor's file. The Supreme Court describes the prosecutor's argument thusly:

[T]he factual basis for the assertion of a Brady claim was available to state habeas counsel. He presses two factors to support this assertion. First, he argues that an examination of Stoltzfus' trial testimony, as well as a letter published in a local newspaper, made it clear that she had had several interviews with Detective Claytor. Second, the fact that the Federal District Court entered an order allowing discovery of the Harrisonburg police files indicates that diligent counsel could have obtained a similar order from the state court.

527 U.S. at 284–285, 119 S.Ct. 1936 (footnotes omitted).

The Supreme Court found these arguments unpersuasive.

Although it is true that petitioner's lawyers—both at trial and in post-trial proceedings—must have known that Stoltzfus had had multiple interviews with the police, it by no means follows that they would have known that records pertaining to those interviews, or that the notes that Stoltzfus sent to the detective, existed and had been suppressed. Indeed, if respondent is correct that Exhibits 2, 7, and 8 were in the prosecutor's "open file," it is especially unlikely that counsel would have suspected that additional im-

peaching evidence was being withheld. The prosecutor must have known about the newspaper articles and Stoltzfus' meetings with Claytor, yet he did not believe that his prosecution file was incomplete.

*Id.* at 285, 119 S.Ct. 1936 (footnote omitted).

Of considerable importance to the Court in its consideration of the facts in *Strickler* was the presumption that a prosecutor would carry out his duty to disclose all exculpatory evidence and "the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination ..." *Id.* at 284, 119 S.Ct. 1936. Concluding that defense counsel's reliance on these facts was reasonable, the court found that it was not incumbent on counsel to search for evidence which the prosecution indicated did not exist.

> Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review. Nor, in our opinion, should such suspicion suffice to impose a duty on counsel to advance a claim for which they have no evidentiary support.... The presumption, well established by " 'tradition and experience,' " that prosecutors have fully " 'discharged their official duties,' " ... is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.

527 U.S. at 286–287, 119 S.Ct. 1936 (citation omitted).

Distinguishing *Gray v. Netherland,* 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996), and *McCleskey v. Zant,* 499 U.S.

467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), on the basis that in those cases the petitioner was "previously aware of the factual basis for his claim but failed to raise it," the Court found that "a defendant cannot conduct the 'reasonable and diligent investigation' mandated by *McCleskey* to preclude a finding of procedural default when the evidence is in the hands of the State." *Id.* at 288, 119 S.Ct. 1936.

In *Banks v. Dretke, supra,* the Court again confronted a case in which the prosecution had suppressed evidence favorable to the defense. As described by the Court, the Fifth Circuit [12] concluded that petitioner Banks failed to overcome his default because he had not been diligent.

> In the Fifth Circuit's view, Banks should have at that time attempted to locate Farr and question him; similarly, he should have asked to interview Deputy Sheriff Huff and other officers involved in investigating the crime.... If such efforts had proved unavailing, the Court of Appeals suggested, Banks might have applied to the state court for assistance.... Banks's lack of diligence in pursuing his 1992 state-court plea, the Court of Appeals concluded, rendered the evidence uncovered in the federal habeas proceeding procedurally barred.

540 U.S. at 687, 124 S.Ct. at 1270.

Cryptically, the Supreme Court was unimpressed with this rationale, exclaiming that "[w]hen police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." 540 U.S. at 674–75, 124 S.Ct. at 1263. Elaborating further, the Court discussed the applicability of *Strickler.*

---

**12.** The Fifth Circuit's opinion is unpublished. *Banks v. Dretke,* 540 U.S. 668, 687, 124 S.Ct.

1256, 1270, 157 L.Ed.2d 1166 (2004).

This case is congruent with *Strickler* in all three respects.[13] First, the State knew of, but kept back, Farr's arrangement with Deputy Sheriff Huff.App. to Pet. for Cert. C43; Tr. of Oral Arg. 33; *cf. Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (prosecutors are responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Second, the State asserted, on the eve of trial, that it would disclose all *Brady* material. App. 361, n. 1; see *supra*, at 1264. As *Strickler* instructs, Banks cannot be faulted for relying on that representation. See 527 U.S., at 283–284, 119 S.Ct. 1936, 144 L.Ed.2d 286 (an "open file policy" is one factor that "explain[s] why trial counsel did not advance [a *Brady* ] claim").

540 U.S. at 692, 124 S.Ct. at 1273.

In *Banks*, the Court once again found lack of due diligence arguments unpersuasive. The State argued that Banks could have attempted to locate a witness or could have interviewed investigating officers to learn about the witness. The Court held that these arguments, accepted by the Fifth Circuit, erroneously *focus on the conduct of the defendant instead of the conduct of the prosecutor.*

> Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed. As we observed in *Strickler*, defense counsel has no "procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." ... The "cause" inquiry, we have also observed,

turns on events or circumstances "external to the defense."

540 U.S. at 695–96, 124 S.Ct. at 1275.

The Court also disparaged the argument that a defendant has the burden to discover favorable evidence so long as it might have been detected, saying that a "rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.*

Relying on the Eleventh Circuit's opinion in *High v. Head*, 209 F.3d 1257 (11th Cir.2000), the respondents in Hallford's case make arguments similar to those made by the *Strickler* and *Banks'* respondents. In *High*, the court found that *Strickler* was not controlling because High's "collateral counsel had actual knowledge or reasonably could have discovered knowledge clearly suggesting that the prosecution may have misinterpreted ... evidence as nonexculpatory." *Id.* at 1265. The respondents argue that Hallford had access to the juvenile court file containing the same documents that caused Hallford's federal habeas counsel to raise the *Brady* claim. Moreover, the respondents suggest that Hallford's state collateral counsel sought admission of that file without even reading it.

> If they had read the file, it contained information that Melinda was initially charged with intentional murder but was adjudicated delinquent for the lesser charge of criminally negligent homicide. Melinda's juvenile court file also contained the name of her lawyer, who was available to testify, but never contacted.

Resp's Br. at 181 (doc. # 154).

The court rejects the respondents' arguments that Hallford had the tools to construct his *Brady* claim and should have been aware of its factual basis. As noted above, nothing in the juvenile file [14] shows

---

**13.** The "three respects" to which the Court refers are the three components of a *Brady* claim. *See Strickler v. Greene*, 527 U.S. 263, 282–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

**14.** Indeed, there was never any writing made

that a deal was made with Melinda. Thus, counsel would have had to suspect that Melinda received favorable treatment in return for her agreement to testify and would have had to conduct further investigation based on this inference. Counsel was under no duty to do so.

Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review. Nor, in our opinion, should such suspicion suffice to impose a duty on counsel to advance a claim for which they have no evidentiary support.

*Strickler,* 527 U.S. at 286, 119 S.Ct. 1936.

This conclusion is reinforced by the context in which the prosecutor's representations about the existence of exculpatory materials arose. The prosecutor's response to an admittedly general *Brady* motion was not merely a response to opposing counsel. Rather, the representations about the prosecutor's compliance with his *Brady* responsibility were also made in the presence of the trial court during a pretrial conference. Hallford's counsel at trial as well as his collateral counsel were certainly entitled to rely on the verity of a representation made in the presence of the court.

At base, the respondents' argument here devolves into a contention that armed with the juvenile file, collateral counsel should have ignored the prosecution's representation about compliance with its duty, and interviewed everyone involved with Melinda's juvenile case to find out what would lead her to testify against her father. The

underlying fallacious assumption grounding that argument is that no child would testify against her father who killed her boyfriend unless the child received something in return. Finding such a duty on the part of any of Hallford's counsel certainly is inconsistent with *Banks* and *Strickler.*[15] In *Strickler,* the court notes that although the defendant's counsel surely knew that Stoltzfus was interviewed by police, "it by no means follows that they would have known that records pertaining to those interviews ... existed and had been suppressed." 527 U.S. at 285, 119 S.Ct. 1936. In its discussion of this question, the *Strickler* Court directly links an inference to be drawn from knowledge of an interview to "[m]ere speculation," insufficient to support either a discovery request or the imposition of "a duty on counsel to advance a claim for which they have no evidentiary support." 527 U.S. at 286, 119 S.Ct. 1936. In the same way, even if counsel had speculated that a deal with Melinda had been made, that speculation unsupported by fact is insufficient to impose a duty of investigation on counsel; therefore, it is likewise insufficient to demonstrate a lack of due diligence.

As briefly discussed above, *Banks* also involved an argument that a habeas petitioner failed to show cause because of a lack of due diligence. In *Banks,* contrary to a prosecution representation of disclosure of all evidence to which the petitioner was entitled, the prosecution did not disclose that one of two crucial witnesses was a paid informant and the other witness was intensively coached by prosecutors and the police.[16] 540 U.S. at 674–75, 124 S.Ct. at

about the agreement made with Melinda; thus, there was no document which counsel could have discovered.

**15.** Arguably this same contention is also inconsistent at least in some respects with *Kyles.* In *Kyles,* the defendant's first trial ended in a mistrial. Counsel, therefore, was very much aware of the damaging nature of

the testimony of four witnesses. Certainly, any competent criminal defense lawyer could speculate that police had taken statements from these persons.

**16.** At trial, this witness denied talking to anyone about his testimony, but the prosecutor did not correct this perjury.

1263. But again, even in the face of information possessed by the petitioner's counsel from which he might have constructed a claim, the court, citing *Strickler*, concluded that "defense counsel has no 'procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.'" 540 U.S. at 695–96, 124 S.Ct. at 1275.

In this case, Hallford's collateral counsel's reading of the juvenile file might have led him to a suspicion that some agreement was made with Melinda. But, there is nothing in the file confirming that suspicion. Counsel's mere suspicion, had he formed it, is insufficient to give rise to a duty on his part to prove the prosecutor's representations false. *See Banks*, 540 U.S. at 697–98, 124 S.Ct. at 1276. The court concludes that Hallford has demonstrated cause for his failure to present his *Brady* claim based on the failure of the prosecution to advise him about the agreement with Melinda.

To save the *Brady* claim from procedural default, Hallford must demonstrate *both* cause and prejudice. *See Wainwright*, 433 U.S. at 82, 97 S.Ct. 2497. Since the court has concluded that Hallford has demonstrated cause, the court must now evaluate whether he was prejudiced by the prosecution's failure to reveal its agreement with Melinda whose testimony could have been impeached with this information.

### 2. *The Prejudice Inquiry*

 Sufficient prejudice exists to excuse a procedurally defaulted *Brady* claim if "the favorable evidence could reasonably be taken to put the case in such a different light as to undermine the confidence of the verdict." *Strickler*, 527 U.S. at 290, 119 S.Ct. 1936 (*quoting Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). The "question is not whether the defendant would more likely than not

have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289–290 (*quoting Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.) This is essentially the same criterion used to determine whether materiality exists under *Brady*. *Id.* at 280–82, 289–96; *Crawford v. Head*, 311 F.3d 1288, 1327 (11th Cir.2002) ("In determining whether sufficient prejudice has been shown to excuse the default of a *Brady* claim, both the Supreme Court and this Court have conflated to a large extent the prejudice inquiry with the materiality standard required to obtain relief under *Brady*.") Impeachment evidence is material, and constitutional error results from its suppression by the State, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Hallford argues that if the State had disclosed Melinda's plea agreement there is at least a reasonable probability that the result of Hallford's trial would have been different because the plea agreement could have been used to impeach Melinda's testimony both at the guilt phase, which was essential to the prosecution's robbery case, as well as impeach her testimony at the penalty phase, where she was the prosecution's only witness. With respect to the guilt phase, Hallford argues that he could not have been convicted of capital murder and become death-eligible unless the prosecution proved beyond a reasonable doubt that he had committed a robbery and that Shannon's murder had occurred *during the* robbery. *See Connolly v. State*, 500 So.2d 57, 62 (Ala.Crim.App.1985)(citing ALA. CODE § 13A–5–39(2)). The essence of Hallford's guilt phase argument is that *if* he could have impeached Melinda's testi-

mony, there is a reasonable probability that he would not have been convicted of robbery-murder and, therefore, not eligible for the death penalty.

### 3. *The Guilt Phase Testimony*

■ The facts of the murder as related by Melinda were corroborated at trial by the testimony of Sammy Robbins, her step brother, who also was present and witnessed the shooting and disposal of the body, R. Ex. P–2 at 261–295. The evidence that Hallford shot and killed Eddie Shannon is overwhelming. However, Melinda was the sole witness who identified the wallet that Hallford burned the day after the murder as the wallet belonging to Shannon. Melinda testified that on the day following the murder she saw Hallford outside their house burning a wallet that belonged to Shannon, that Hallford said to her that Shannon was a "cheapskate" because he did not have any money in the wallet and that Hallford showed her a picture of another girl from the wallet claiming that Shannon was unfaithful to her. Ex. P–2 at 477–80. The question which the court must confront is whether there is a reasonable probability that had the suppressed agreement with Melinda been disclosed to Hallford, the results of the guilt phase of the trial would have been different because he could have discredited her testimony which connected him and Shannon's missing wallet. Expressed differently, the court must decide if the suppression of the impeaching evidence puts the whole robbery-murder case in such a different light as to undermine confidence in the verdict. *Strickler,* 527 U.S. at 289–290, 119 S.Ct. 1936; *Kyles,* 514 U.S. at 434–435, 115 S.Ct. 1555.

Sammy Robbins testified that on the morning after Shannon's murder Hallford instructed him to get a shotgun and to drive with him to the bridge where the night before Hallford had dumped Shannon's body. Hallford's purpose was to confirm that the body was not floating and did not need to be sunk by a gun shot. R. Ex. P–2 at 294–295. Afterward, they returned home where Hallford instructed Robbins to build a fire. Robbins then watched Hallford go through a wallet and burn it and everything in it. Robbins saw a military ID card that was orange and white, but did not see the name or the picture on it because Hallford had his thumb over it. R. Ex. P–2 at 297–298. Olen Johns, Shannon's adoptive father, testified that Shannon had a wallet in which he carried his military ID card, but that he had not seen the wallet since the night Shannon went missing. R. Ex. P–2 at 520–521.

This testimony, inferentially connecting the wallet Hallford burned the morning after the murder to Shannon, corroborates Melinda's testimony, but it is, of course, circumstantial. However, under Alabama law, that distinction is not material.[17]

A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. *Chafin v. State,* 333 So.2d 599 (Ala.Cr.App.) *cert. denied,* 333 So.2d 609 (Ala.1976). As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. *Agee v. State,* 470 So.2d 1331 (Ala.Crim. App.1985). In reviewing a conviction based on circumstantial evidence, "[t]he test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." *Cumbo*

---

**17.** Thus, Hallford's argument that "no other testimony established that Hallford stole or even possessed Shannon's wallet" is not factually correct.

*v. State,* 368 So.2d at 874. *See also Ward v. State,* 557 So.2d 848, 850 (Ala. Cr.App.1990).

*McMillian v. State,* 594 So.2d 1253, 1263 (Ala.Cr.App.1991).

Moreover, even if the jury had discounted Melinda's testimony,[18] there is other testimony about the wallet from which a jury could reasonably conclude that the wallet Hallford burned the day after Shannon's murder belonged to Shannon. First, Robbins' testimony about the timing of the disposal of the wallet in the fire by Hallford on the morning following the murder points to the conclusion that it was the victim's wallet.[19] Second, Robbins' and Johns' testimony about the contents of the wallet Hallford burned and the contents of Shannon's wallet were consistent. Johns testified that Shannon carried a military ID card in his wallet, and Robbins testified that he saw Hallford take a military ID from the wallet and burn it in the fire. Third, Robbins' testimony about the burning of the wallet was consistent with Johns' testimony that Shannon's wallet had not been seen since his disappearance. The court concludes that on the basis of Robbins' and Johns' testimony alone "a jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt." *Id.* More to the point, the court concludes that had the impeachment evidence of Melinda's deal been disclosed and Melinda's testimony

discredited at trial, "there is [not] a reasonable probability that the result of the proceeding would have been different." *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375. A jury reasonably could conclude even in the absence of Melinda's testimony that Hallford was guilty of the capital crime of murder committed during the course of a robbery. The undisclosed agreement with Melinda and its consequences for the trial do not undermine the court's confidence in the verdict of guilt.

### 4. *The Penalty Phase*

■ It is beyond argument that a state has a constitutional responsibility to tailor and apply its capital punishment law in a manner that avoids an arbitrary and capricious infliction of the death penalty. *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). At the penalty phase of Hallford's trial only two witnesses testified. Melinda testified on behalf of the State solely about her long-standing incestuous relationship with Hallford and Hallford's jealousy of Shannon. R. Ex. P–7 at 718–720. Hallford's mother, Mertie Boyd, testified about the care Hallford provided for his children. She also called him a "good son," described briefly how he always helped her and begged the jury to show him mercy. R. Ex. P–7 at 720–724. The Alabama Court of Criminal Appeals considered and upheld the admis-

---

**18.** In making this observation, the court is cognizant that it is not correct to analyze this question in terms of whether in the absence of Melinda's testimony, the defendant more likely than not would have received a different verdict. *See e.g., Strickler v. Greene,* 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). However, it is analytically helpful in making the fair trial determination to consider the state of the evidence without consideration of Melinda's testimony. *Id.* at 292, 119 S.Ct. 1936 ("Even if Stoltzfus and her testimony had been entirely discredited ... ").

**19.** All of the facts relating to events after the murder show that Hallford was preoccupied with obscuring his actions. After the murder, he and Robbins returned to the bridge where Hallford shot Shannon twice and cleaned up the blood on the deck of the bridge. The next morning, Hallford burned the wallet after returning to the bridge to insure that the body was not floating in the water. Viewed in the context of all Hallford's actions, common sense suggests that the burning of the wallet was not merely an isolated event unconnected to Shannon's murder.

sibility of Melinda's testimony under state law.

We find the testimony that Melinda Hallford had been having an incestuous relationship with her father prior to the killing was relevant and of probative value in the sentencing aspect of the trial. It was relevant to negate any claim by appellant that he had no significant history of prior criminal activity. § 13A–5–51(1). In addition, appellant had testified during the guilty phase of the trial that he had given his children, including Melinda, a home and had taken care of them when no one else would. This testimony was before the jury for their consideration of a proper sentence. § 13A–5–45(c). Thus, the testimony of the incestuous relationship was also admissible for the purpose of negating appellant's testimony, which obviously had been offered in an effort to portray himself as a good father and therefore a person of good character. § 13A–5–52.

*Hallford v. State,* 548 So.2d 526, 537 (Ala. Crim.App.1988). Moreover, the admissibility of this type of testimony is consistent with the Constitution.

We have held that a capital defendant is entitled to introduce any relevant mitigating evidence that he proffers in support of a sentence less than death. *Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 876, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). But just as the defendant has the right to introduce any sort of relevant mitigating evidence, the State is entitled to rebut that evidence with proof of its own. *See Payne v. Tennessee,* 501 U.S. at 825, 111 S.Ct. at 2608 ("[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in") (internal quotation marks omitted); *id.,* at 860, 111 S.Ct. at 2625 (STEVENS, J., dissenting).

*Dawson v. Delaware,* 503 U.S. 159, 167, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992).[20]

■■■ Criminal conduct, even absent a conviction, is relevant and properly considered by the jury. *See Tucker v. Kemp,* 762 F.2d 1480, 1487 (11th Cir.1985) (*en banc* ) ("In addition to previous convictions, it is acceptable to consider evidence of crimes for which a defendant has been indicted but not convicted. Activities for which there has been no charge filed can be considered as well. In general, the relevant inquiry is whether it is reliable.") (citations omitted), *vacated,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *reinstated,* 802 F.2d 1293 (11th Cir.1986) (en banc) (per curiam). *See also Devier v. Zant,* 3 F.3d 1445, 1464 –1465 (11th Cir. 1993). In sum, one of the tasks of the sentencing jury in the penalty phase of a capital case is to carefully consider the character of a defendant in reaching its decision. Imposition of the death penalty must be "directly related to the personal culpability of the criminal defendant," and "reflect a reasoned moral response to the defendant's background, character, and crime." *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (plurality opinion). *Lockett* forbids precluding a jury "from considering, as a miti-

**20.** *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) overruled *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) which a mere six years earlier had invalidated a state law calling for victim impact statements at sentencing trials in capital proceedings.

gating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). *See also Penry v. Lynaugh,* 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (O'Connor, J., concurrence) ("This stage enhances reliability by ensuring that the sentencer has considered all relevant factors pertaining to the individual's culpability and character before making its 'reasoned moral response.' ").

Hallford argues that his inability to impeach Melinda's testimony about her sexual relationship with him and his jealousy of Shannon, resulted in a sentence unworthy of confidence because it was based on unreliable evidence. Hallford argues further that prejudice ensued because of the manner in which the trial court instructed the jury that the penalty phase evidence could be considered by them. In part, this is what the trial court instructed the jury.

> The law of this State provides that the punishment for the capital offense for which you have convicted the Defendant is either by death by electrocution or life imprisonment without eligibility for parole.

> The law also provides that which of those two punishments should be imposed upon the Defendant depends upon whether any aggravating circumstances exist, and if so, whether the aggravating circumstances out weigh any mitigating circumstances.

> An aggravating circumstance is a circumstances specified by law which indicates or tends to indicate that the Defendant should be sentenced to death.

> A mitigating circumstance is any circumstance that indicates or tends to indicate that the Defendant should be sentenced to life imprisonment without parole instead of death.

> The issue at the sentencing hearing concerns circumstances of aggravation and circumstances of mitigation that you should consider and weigh against each other in deciding what the proper punishment is in this case.

> In making your recommendation concerning what the punishment should be, you must determine whether any aggravating circumstances exist, and if so, you must determine whether any mitigating circumstances exist. In making your determination concerning the existence of aggravating and mitigating circumstances, you should consider the evidence presented at this sentencing hearing. You should also consider any evidence that was presented during the guilt phase of the trial that is relevant to the existence of any aggravating or mitigating circumstances.

R. Ex. P–9 at 725–727.

The court then charged the jury that the law provided a list of aggravating circumstances, of which there were only two to consider in Hallford's case. *Id.* at 728. The first circumstance described by the court was that the "capital offense was committed while the Defendant was engaged in or attempting to commit a flight after committing, or attempting to commit a robbery." *Id.* The second aggravator described by the court was that "the capital offense was especially heinous, atrocious or cruel compared to other capital offenses." *Id.*

> The term "heinous" means extremely wicked or shockingly evil. The term "atrocious" means outrageously wicked and violent. The term "cruel" means designed to inflict a high degree of pain with other indifference to or even enjoyment of the suffering of others.

R. Ex. P–9 at 729.

After hearing the testimony of Melinda and Hallford's mother during the penalty

phase, the jury recommended by a vote of 10–2 that a sentence of death be imposed. This is the minimum vote by which a death sentence may be recommended. ALA. CODE 13A–5–46(f). After the conclusion of the sentencing hearing, the trial judge determined that two aggravating circumstances—(1) that the capital offense was committed while Hallford was engaged in or attempting to commit a robbery, and (2) that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses—outweighed any mitigating circumstances and imposed a sentence of death. R. Ex. P–12 at 761–765.

Hallford argues that his inability to discredit Melinda's testimony about her sexual relationship with him, which was admitted without a limiting instruction, affected the jury's determination of the existence of the heinous, atrocious or cruel aggravating factor, the consideration of which should have been limited to the facts of the crime. In support of this position, Hallford points to the court's general instructions about aggravating and mitigating circumstances where the court twice instructed the jury that in determining the existence of aggravating and mitigating circumstances, the jury should consider the evidence presented at the guilt stage of the trial and at the sentencing hearing. R. Ex. P–12 at 727 and 731.

*Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), holding that a sentencer's weighing among others of a vague aggravating factor taints a death sentence, demonstrates the impor-

tance of the weighing process which a sentencing jury must undertake.[21]

Since *Furman* [*v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ], our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action. *Id.* at 362, 108 S.Ct. 1853.

In sum "above all, capital sentencing must be reliable, accurate, and nonarbitrary." *Saffle v. Parks,* 494 U.S. 484, 493, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). In Alabama, the jury has an essential role in the sentencing process. *Brownlee v. Haley,* 306 F.3d 1043, 1078 (11th Cir.2002). The Alabama courts characterized the incest evidence presented through the testimony of Melinda as relevant to negate Hallford's claim of no significant criminal history and his portrayal of himself as a good person. The gravamen of Hallford's argument is that his inability to impeach Melinda goes directly to the reliability of her testimony and, consequently, the reliability of the jury's verdict. After a careful review of all the evidence, the court concludes there is no reasonable probability that the results of the jury's recommendation or the trial judge's sentence would have been different if Hallford had known of Melinda's agreement and discredited her with that information.

It is important to remember that the trial judge instructed the jury during the penalty phase that they were to consider

---

21. At the time this case was tried, Alabama juries recommended a sentence in death cases. That distinction makes no difference, however. *See Harris v. Alabama,* 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) ("If the judge must consider the jury verdict in sentencing a capital defendant, as the [Alabama] statute plainly requires, then it follows that a sentence is invalid if the recom-

mendation upon which it partially rests was rendered erroneously."); *Espinosa v. Florida,* 505 U.S. 1079, 1082, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992) ("[I]f a weighing State decides to place capital sentencing authority in two actors rather than one, neither actor must be permitted to weigh invalid aggravating circumstances.")

all of the evidence presented in both phases of the trial. The court will do likewise. From that review, it is patently obvious that Melinda's credibility was already at issue and had been at issue throughout the entire trial. When Melinda was first interviewed she was very reluctant to give investigators any information and denied any involvement with Shannon in any way, including his death. R. Ex. P–2 at 484, 557–558. Shortly after her arrest, she refused to speak with investigators about Shannon's death. One month later, she pled guilty to a substantially reduced charge and served only 5 weeks in custody. She thereafter returned to Alabama to testify against Hallford, her father. The rapidity of Melinda's transformation from denial and silence to witness for the prosecution is certainly sufficient to give any trier of fact reason to question why such a transformation occurred. But it is Hallford's own testimony which cements the court's view about the lack of prejudice flowing from his not knowing about Melinda's bargain. Hallford testified during the guilt phase of his trial, and he used that opportunity to cast doubt on the testimony of all of his children who testified against him. Hallford did so by suggesting that Investigator Ford had improperly influenced their testimony.

Q. Phil, before you were arrested, did any of the children, to your knowledge, implicate you in this matter?

A. None that I know of.

Q. It was only after you were arrested and after Walter Ford interviewed them that they began implicating you, isn't that right?

A. After they were put into juvenile detention, from what I understand.

Q. But up until then nobody implicated you in this matter, did they?

A. No, none whatsoever.

R. Ex. P–3 at 610–611.

Shortly after making these observations, Hallford focused directly on Melinda's testimony and Ford's affect on her.

Q. Do you have any idea why Melinda Hallford would change her story from initially saying that you were not involved in this and that you had nothing to do with this, and change it to the way she testified yesterday?

A. Any time you've been locked up or held in detention, it's hard to realize what goes through the mind. If she thought that was the only way she was going to be released, I imagine anyone on the jury if they were locked up and were expecting to be tried on a murder charge would say anything Mr. Walter Ford would want. You have to be in that predicament to really know.

R. Ex. P–3 at 613–614. On cross-examination of Hallford, the prosecutor got Hallford to admit that he was in a similar predicament and, consequently, just as likely to lie to extricate himself from the trouble.

Q. You offered an explanation as to why Melinda would change her story. You said since she was charged with murder or might be charged with murder that she or anybody on the jury or any reasonable person would lie to get out of that predicament, isn't that what you said?

A. You'd just have to be locked up and be in that situation to understand, sir.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. You're in that predicament, aren't you?

A. I cannot understand how my daughter feels. I don't know how she felt when she was locked up.

Q. Let me ask you this. You're in that predicament, so, would you lie to get out of it?

\* \* \* \* \* \*

A. I probably would. If I could walk out of here free, yes, I would tell a lie.

Q. You would lie about what happened on April the 12th?

A. I wouldn't get up here and be sworn in all this and tell no lie, no.

Q. All right.

A. But if I was down here in a detention center with juvenile authorities and agree with Mr. Ford that if he would let me go home, I would probably go along with Mr. Ford.

R. Ex. P–3 at 623–625.

By the time Hallford testified, the jury already well knew that Melinda was not a young woman of refinement. Among other things, Melinda had read to the jury two letters she wrote to Hallford while she was in juvenile detention. In one of the letters she complained that she couldn't smoke or curse and expressed that it was "harder than ever to be away from ... [Hallford] now." R. Ex. P–2 at 487. More pointedly, Melinda wrote

I told them I wasn't going to talk to them unless my lawyer was present. Did you tell them our names and all or what? I didn't tell them nothing.

I've been sick to my stomach about what they told me, if I didn't help them to put you away they would send me to prison to. (sic) Mr. Ford had a statement that he wanted me to sign, he said it was what happened. People in here think I'm a total bitch because when they ask me what I'm in for I tell them none of your God Dang business ...

I know this is all going to end sometime, but how? How the hell is it going to end? To tell the truth, I'm really scared, I'm scared for you, me, and the kids. The more I think about the threats and what Ford said he would do, I just want it all to end ... [22]

R. Ex. P–2 at 488.

■ Jurors as factfinders are permitted to formulate common sense conclusions about human behavior. *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). By the time the question of punishment was put to this jury, they had ample reason to question Melinda's credibility. If Hallford had known that Melinda in fact had received favorable treatment for her testimony, it is possible that one or more of the ten jurors who voted for death might have changed their minds, but there is not a reasonable probability they would have done so. The jurors knew Melinda was not in jail. Melinda through her letter from the detention facility had expressed to Hallford her fear about the consequences for her and the alleged threats from Ford. The jurors had heard Melinda's father question her credibility because of what Ford did. Confirmation of the bargain might have mattered, but not enough. In *Kelley v. Secretary For The Dep't of Corrections,* 377 F.3d 1317 (11th Cir.2004), the court said

Whether or not the five items the district court identified should have been disclosed to defense counsel, their effect taken individually and cumulatively could not have been legally significant to the outcome of Kelley's trial. As explained at length above, defense counsel effectively capitalized—in one way or

22. There is a post script to this letter: "Mr. Ford said that I would be proud to say or do anything that he ask of me, by the time he was through with me. But you know better

than that." Melinda denied that she wrote this, claiming that it was in someone else's handwriting. R. Ex. P–2 at 489.

another—on every potentially valuable argument the five items support, even though the items themselves were unavailable to counsel at the time of trial. It follows in this instance that the pretrial disclosure of the items would not have created a "reasonable probability that ... the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. Thus, although the State ultimately prevailed in a factually challenging case, Kelley's due process rights were not offended. *Id.* at 1370.

In the same way, Hallford capitalized on the facts to challenge Melinda's credibility. There is no reasonable probability that the outcome of the penalty phase would have been different had Hallford known what he obviously suspected about Melinda's favorable treatment. In the absence of a reasonable probability of a different result, there is no prejudice; the court's confidence in the penalty phase verdict is not undermined, and Hallford is not entitled to relief on his *Brady* claim.

### III. MERITS OF THE REMAINING CLAIMS

A. Ineffective Assistance of Counsel Claim in the Penalty Phase

Hallford contends that his counsel was ineffective during the penalty phase of his trial for three reasons. First, Hallford alleges that his counsel opened the door for the prosecution to present otherwise inadmissible evidence of Hallford's incestuous relationship with his daughter. The incest evidence was allowed to rebut testimony elicited from Hallford earlier that he was a "good father". Hallford complains that because his counsel knew the state was aware of the incest evidence, introduction of the "good father" evidence, which opened the door to admission of the incest evidence, was ineffective. Second, Hallford claims that his counsel was ineffective

for failing to request a limiting instruction regarding the jury's consideration of the incest evidence. Third, Hallford alleges that his counsel was ineffective for failing to conduct a reasonable investigation into his background and to discover and present evidence that would have provided a basis for a sentence less than death.

■ The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial. The petitioner must satisfy the requirements of a two-pronged test to prevail on his claim of ineffective assistance of counsel. The petitioner first must make a threshold showing that his attorney's performance "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. In other words, criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance. *Roe v. Flores–Ortega*, 528 U.S. 470, 476, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) *quoting Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Once the threshold test for ineffectiveness is met, the petitioner must show that the deficient performance of his counsel prejudiced his defense. *Strickland, supra* at 687, 104 S.Ct. 2052. To establish prejudice, the petitioner must first show that there is "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[P]etitioners must affirmatively prove prejudice because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. [T]hat the errors had some conceivable effect on the outcome of the proceeding' is

insufficient to show prejudice." *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir.2000)(*quoting Strickland*, 466 U.S. at 693, 104 S.Ct. 2052). The prejudice component of the *Strickland* test focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law titles him. *Williams v. Taylor*, 529 U.S. 362, 393 n. 17, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

 Any review of an ineffective assistance of counsel claim is conducted from the perspective of defense counsel based on facts "as they were known to counsel *at the time of the representation.*" *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir.1992). There is a strong presumption that counsel's performance was reasonable and adequate, and great deference must be shown to choices dictated by reasonable trial strategy. *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.1994). A strategic or tactical decision by counsel amounts to ineffective assistance only if it is so "patently unreasonable a ... decision that no competent attorney would have chosen" it. *Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir.2001). Indeed,

> [t]rial counsel's performance is entitled to " 'highly deferential' judicial scrutiny." *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir.2001) (citation omitted). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. This Court *en banc* established this guideline:

> "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable.... [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' " *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir.2000) (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)). Thus, under federal law, there is "a strong presumption in favor of competence [and] the petitioner's burden of persuasion— though the presumption is not insurmountable—is a heavy one." *Chandler*, 218 F.3d at 1314 (footnote and citations omitted); *see also Strickland*, 466 U.S. at 689–90, 104 S.Ct. at 2065–66 (noting that courts must "indulge [the] strong presumption" that counsel's performance was reasonable and that counsel "made all significant decisions in the exercise of reasonable professional judgment"). Accordingly, this Court "must recognize that counsel does not enjoy the benefit of unlimited time and resources," and that "[e]very counsel is faced with a zero-sum calculation on time, resources, and defenses to pursue at trial." *Chandler*, 218 F.3d at 1314 n. 14.

*Turner v. Crosby*, 339 F.3d 1247, 1275–76 (11th Cir.2003).

### (1) Opening the Door for Evidence of Incest

 The court will first address Hallford's claim that his counsel was ineffective for opening the door for the prosecution to present otherwise inadmissible evidence of Hallford's incestuous relationship with his daughter.[23] The evidence of the incest

---

**23.** The court couches this argument in the terms presented by the petitioner. The court is not asked to decide whether the incest testimony offered by Melinda might have been

properly admitted during the guilt phase for purposes of proving motive. Rather the court will deal with the argument that this highly prejudicial testimony, admitted during the

was allowed because trial counsel at the guilt phase had elicited testimony from Hallford in an effort to portray him as a "good father." *Hallford,* 548 So.2d at 544. Petitioner argues that "[t]rial counsel's action, taken with the knowledge that the State was aware of the incestuous relationship between Hallford and his daughter, defies comprehension and represents a paradigmatic example of ineffective assistance of counsel."

Hallford's trial counsel testified at the Rule 32 hearing that, although he left the decision of whether to testify during the guilt phase to Hallford, he believed it was best for Hallford to testify since his defense was "I didn't do it. It wasn't me." R. Ex. P–92 at 111. Moreover, counsel testified that it was his intent to show through Hallford's testimony "[t]hat perhaps the children had some sort of reasons for their testimony and turning on him." *Id.* Hallford's trial counsel testified that he intended to demonstrate through Hallford's testimony that Hallford had taken care of his children and step-children and they were very close to him, but that he disapproved of certain of their actions such as "smoking dope." As a result he sometimes subjected them to harsh treatment which in turn suggests a reason why they might have conspired to testify against him. *Id.* at 112. Also, trial counsel believed that a collateral benefit of the "good father" testimony was that it might generate some sympathy for Hallford. *Id.* at 113.

In this case, Sammy Robbins, Hallford's step son, and Melinda Hallford, Hallford's daughter, each gave an eye witness account which demonstrated unequivocally that Hallford lured Eddie Shannon to a deserted bridge, shot and ultimately killed him and dumped his body into the river. Considering that the most incriminating evidence against Hallford, who denied any

involvement in the murder, came from his child and step-child, the court concludes that it was not "patently unreasonable" for trial counsel to present evidence to show that they had a motive to testify against Hallford. Indeed, in determining guilt the jury in this case would be asked to decide whether they believed Hallford's testimony that he had no part in the crime or Sammy and Melinda's testimony that Hallford had committed the murder. No trial or lawyer is perfect. All trial lawyers present evidence with the knowledge that this may lead to the presentation of damaging or contrary evidence. Facts seldom occur in isolation of other facts. Lawyers, therefore, often must make difficult judgments about the relative benefit and harm which may result from some evidentiary presentations. When Hallford testified, the focal issue was his guilt and the testimony of his children was key to the prosecution's establishing that guilt. The court cannot say that at this point in the trial no competent attorney would have attempted through Hallford's testimony to give the jury some reason to disbelieve Sammy and Melinda's testimony as well as generate some sympathy for Hallford. *See Kelly,* 820 F.2d at 1176. Moreover, counsel is presumed to know that the evidence of the incest might well have been admissible under any circumstances during the penalty phase notwithstanding the favorable ruling on his motion in limine. In *Tucker v. Kemp,* the court wrote that

[o]ne class of information which is particularly relevant to the sentencing decision is the defendant's previous criminal activity. In addition to previous convictions, it is acceptable to consider evidence of crimes for which a defendant has been indicted but not convicted. Activities for which there has been no charge filed can be considered as well.

penalty phase, was misunderstood by the jury

to be evidence of aggravating circumstances.

In general, the relevant inquiry for information at sentencing is whether it is reliable.

762 F.2d 1480, 1486–87 (11th Cir.) (*en banc*), *vacated,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *reinstated,* 802 F.2d 1293 (11th Cir.1986), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987). Accordingly, the court concludes that because Hallford cannot demonstrate that his attorney's performance "fell below an objective standard of reasonableness", *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, this ineffectiveness claim lacks merit.

(2.) Failure to Request a Limiting Instruction

■ Next Hallford claims that his counsel was ineffective for failing to request a limiting instruction regarding the jury's consideration of the incest evidence at the penalty phase. Trial counsel considered Melinda's testimony of her incestuous relationship with Hallford to be "highly prejudicial." Accordingly, he filed a motion in limine to prevent its admission and made an objection during the guilt phase of the trial in an effort to keep this evidence away from the jury. R. Ex. P–92 at 131–132. However, once the testimony was admitted during the penalty phase of the trial, counsel did not request that the court give a limiting instruction to the jury that they should not consider this testimony for the purpose of determining the existence of the aggravating factors and weighing them against the mitigating factors. Hallford contends that because this was the only testimony presented by the prosecution, because it directly followed a statement by the trial court that the prosecution was about to introduce evidence of aggravating circumstances and because the court's instructions on aggravating and mitigating circumstances followed closely on the heels of this testimony, counsel was ineffective for failing to request a limiting instruction. Hallford argues that absent a limiting instruction there is a reasonable probability that the jury may have thought that his incestuous relationship with Melinda was an accompanying additional act to the actual commission of the crime. In sum, Hallford argues that counsel was ineffective for not requesting a limiting instruction and he was prejudiced because there is a reasonable probability that with such an instruction the jury would not have found that his actual commission of the crime was "accompanied by such additional acts as to set the crime apart from the norm of capital offenses." R. Ex. P–9 at 730 (trial court's instructions to the jury).

To be sure, Melinda's testimony, including the incest testimony, was the only testimony the prosecution presented during the penalty phase, but it was not the only evidence presented by the prosecution. Following its opening statement and before calling Melinda, the prosecutor offered into evidence certified copies of Hallford's prior grand larceny and burglary convictions. At the time of their introduction, but before they were admitted into evidence, the court told the jury that the two convictions could not be considered by them as an aggravating circumstance because "they do not fit the aggravating circumstance category. However, depending on how the evidence comes in they possibly could be considered to negate mitigating circumstances." [24] R. Ex. P–7 at

---

24. At the conclusion of the evidence presentation at the sentencing hearing, on motion by the prosecution and over objection, the court admitted the prior convictions records of the defendant. The court charged the jury that the documents were "not introduced as being evidence of aggravating circumstances but they're being introduced to negate mitigating circumstances, and that is whether the Defendant has a prior significant criminal history." R. Ex. P–9 at 723–724.

716. Then the prosecutor asked the court to instruct the jury that they could consider the evidence from the guilt phase that would be "relevant to mitigating and aggravating circumstances for the jury's consideration."[25] *Id.* Over objection, the court charged the jury that they could "consider anything that ... [they] heard in the evidence Tuesday and Wednesday that would relate or be relevant to any time (sic) of aggravating circumstances ..." R. Ex. P–7 at 717.

> Everything you heard Tuesday and Wednesday and that you believe happened beyond a reasonable doubt is relevant to aggravating circumstances and you may consider that today at the sentencing hearing.

*Id.*

Then, the prosecutor called Melinda. She confirmed that Eddie Shannon had been her boyfriend and that she also had a sexual relationship with Hallford late in 1985.[26] She further testified that when she was 7 or 8 she had a sexual relationship with Hallford. *Id.* at 719, 104 S.Ct. 2052. Then, the following occurred:

> Q. Did your father ever say anything to you about Eddie Shannon?
>
> A. Not much.

> Q. Did he every say anything about you seeing him?
>
> A. He didn't like it.
>
> Q. He didn't like it?
>
> A. No.
>
> Q. Did he ever say to you that he was jealous of someone else's affection for you?
>
> A. Yes, sir.
>
> Q. How did he say that?
>
> A. I don't remember exactly how he put it.
>
> Q. In effect, what did he say.
>
> A. He said that I was his and that he didn't want nobody else looking at me.

R. Ex. P–7 at 719–720.

Counsel testified that he did not recall whether he requested a limiting instruction, but explained that based on his prior experience the judge "covers that in his Oral Charge to the Jury." R. Ex. P–92 at 133. Unfortunately, the judge failed to do that in this case. For purposes of resolution of this issue, the court will assume *arguendo* that counsel's failure to request a limiting instruction to guide the jury about how to consider the incest testimony was ineffective assistance.[27]

---

25. The prosecutor asked the court to "introduce the evidence of a prior trial ..." but it is clear from the transcript that the trial court understood this to refer to the evidence admitted in the guilt phase of the trial. R. Ex. P–7 at 716–717.

26. Hallford's counsel's objections to this testimony and motion for mistrial were denied. R. 718.

27. This ineffective assistance of counsel claim was raised during Hallford's state Rule 32 proceeding in state court. The Alabama Court of Criminal Appeals considered this claim and said the following about it:

> As the state correctly argues in its brief, the trial court thoroughly instructed the jury on the aggravating circumstances. Further-

more, this court on direct appeal reviewed the court's instructions and found no plain error. A finding of no plain error is one factor to consider when assessing the performance of trial counsel. Taking into account the facts of this case, we cannot say that counsel's performance was ineffective for failing to request such a limiting instruction.

*Hallford v. State,* 629 So.2d 6, 10 (Ala.Crim. App.1992). Of course, in a pre-AEDPA case, this conclusion is not entitled to deference because the question of ineffectiveness is a mixed question of fact and law. *See e.g. Hardwick v. Crosby,* 320 F.3d 1127, 1159 (11th Cir.2003).

The court must now determine whether counsel's performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell,* 506 U.S. at 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The court's confidence in a sentence of death is undermined if the petitioner can show that "but for counsel's unprofessional errors, there is a reasonable probability that the sentencer would have weighed the balance of aggravating and mitigating factors to find that the circumstances did not warrant the death penalty." *Weeks v. Jones,* 26 F.3d 1030, 1042 (11th Cir.1994). Undoubtedly, there is a danger that the evidence of this sexually deviant conduct could create moral revulsion in jurors leading to a death sentence based not on legitimate sentencing criteria, but on the desire to punish the sexual conduct. *See Beam v. Paskett,* 3 F.3d 1301, 1309 (9th Cir.1993)("Simply put, a state may not use the death penalty as a mechanism for enforcing societal norms regarding sexual activity."). Nonetheless, the court is convinced after careful consideration of the issue that Hallford suffered no prejudice because there is no reasonable probability that a limiting instruction would have resulted in a different sentence.

At the time of Hallford's trial, Alabama's capital sentencing scheme entitled a defendant convicted of capital murder to a sentencing hearing before the trial jury, ALA. CODE § 13A–5–46, during which the prosecution must prove beyond a reasonable doubt the existence of aggravating factors. The verdict of the jury is "advisory." ALA. CODE § 13A–5–46(e).[28] A simple majority is needed for a verdict of life without parole; at least 10 jurors must agree for a recommendation of the death penalty.

The sentencer under the Alabama scheme is the trial judge who is required to consider all evidence, make written findings about aggravating and mitigating circumstances and impose a sentence after determining "whether the aggravating circumstances ... outweigh the mitigating circumstances ... and in so doing the trial court shall consider the recommendation of the jury ..." ALA. CODE § 13A–5–47(e). An appeal of a death sentence is automatic and the appellate court must independently weigh aggravating and mitigating circumstances to determine if the punishment is disproportionate with sentences rendered in comparable cases. ALA. CODE § 13A–5–53(b).

Hallford's ineffectiveness claim, without making specific reference to it, calls to mind *Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), in which the Court held that if a weighing state places capital sentencing authority in both a jury and a judge, neither actor is permitted to weigh an invalid aggravating circumstance. However, two years after *Espinosa,* the Court upheld Alabama's statutory scheme in *Harris v. Alabama,* 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) in which the court held that

---

**28.** The entire subsection states as follows:

(e) After deliberation, the jury shall return an advisory verdict as follows:

(1) If the jury determines that no aggravating circumstances as defined in Section 13A–5–49 exist, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole;

(2) If the jury determines that one or more aggravating circumstances as defined in Section 13A–5–49 exist but do not outweigh the mitigating circumstances, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole;

(3) If the jury determines that one or more aggravating circumstances as defined in Section 13A–5–49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death.

the Eighth Amendment did not require Alabama to specify the weight a sentencing judge must give to the jury's verdict. *Espinosa* is not retroactive to cases which were final before it was announced. *Lambrix v. Singletary*, 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). To find prejudice because the jury in this case may have improperly considered the incest evidence because no limiting instruction was requested is tantamount to giving Hallford the retroactive benefit of *Espinosa*.

The trial judge in his written findings and order imposing the death penalty, made the following findings:

On April 12 or April 13, 1987, Philip D. Hallford instructed his daughter ... to call the deceased, Charles Eddie Shannon, age 16. Melinda was to arrange a meeting between herself and Eddie on an abandoned road leading to an old abandoned bridge traversing the Choctawatchee River in Dale County, Alabama.

After the call, around 1:00 A.M. on April 13, 1986, Eddie Shannon went to the designated place to meet Melinda.

Philip Hallford and his step-son, Sammy Joe Robbins, went with Melinda to the meeting place in Phillip Hallford's car. Philip Hallford and Sammy Joe Robbins left the car and hid in the dark. Melinda Hallford remained in the car on the driver's side. Eddie Shannon came up to the car and began talking to Melinda. Philip Hallford then approached Eddie, turned him around and after a brief struggle, shot Eddie Shannon through the roof of the mouth with a 22 pistol. During this confrontation, Philip Hallford made the statement in substance as follows: "This will teach you to do f....with someone elses (sic) ass". Hallford then dragged Eddie down to the old bridge. Sammy Joe and Melinda heard two more shots. According to the autopsy, these two shots would have been to the forehead and above the left ear.

Philip Hallford took Eddie's wallet and then rolled him into the river.

Philip Hallford Sammy Joe Robbins and Melinda Hallford returned home. Sammy Joe and Philip Hallford returned to the scene later with a 5 gallon gas jug and broom and cleaned up the blood on the bridge. Later, according to the testimony of Sammy Joe, Sammy Joe and Philip Hallford returned to the new bridge with a shotgun to see if the body was floating or visible and if so, they planned to sink it.

The Court finds from the testimony of Melinda Hallford given at the sentencing hearing before the jury that she and her father had had sexual relations for several years and that he was jealous of her.

The Court further finds that Philip Hallford planned to kill Charles Eddie Shannon and cover up the crime by disposing of the body in such a way so that it could not be found or identified and in so doing, he stole Eddie Shannon's wallet and shoved him into the river.

The Court finds that the robbery of the billfold was not committed as a mere afterthought, but was part of a plan to cover up the crime and the identity of the victim

R. Ex. P–14 at 76–77.

Having made these factual findings, the court, after stating that Hallford was guilty of murder during a robbery in violation of ALA. CODE § 13A–5–40(2), began the weighing process.

The Court has considered each aggravating circumstance enumerated in Section 13A–5–49, *Code of Alabama* (1975), and the Court finds that the capital offense was committed while the defendant was engaged in the commission of or an attempt to committ (sic) or flight

after committing or attempting to commit Robbery.

The court further finds that the capital offense in this cause was especially heinous, atrocious or cruel compared to other capital cases.

Philip Hallford, age 39, instructed his 15–year–old daughter to lure Eddie Shannon, age 16, to an abandoned road near a closed out bridge over the Choctawatchee River. Based on the reasonable inference from the evidence, the defendant lured the 16–year old boy to this area so that he could kill him in front of his daughter and stepson and and dispose of the body. The defendant hid in the dark and after the deceased approached the car, he shot the deceased through the roof of his mouth. He then dragged or pulled the pleading victim along to the bridge where he shot him two more times in the head. He removed his wallet and other items that would help identify the victim and shoved him into the river, knowing that after so long the body would decompose.

This was an execution type slaying, evincing a cold-blooded, calculated design to kill. The defendant deliberately shot the victim in the roof of the mouth and after the victim was virtually defenseless, but still conscious, he shot the victim in the head two more times and threw the victim into the river to avoid a later identification. The conduct of the defendant throughout this episode demonstrates conduct that is totally and senselessly bereft and devoid of any regard for human life.

*Id.* at 77–78.

Thereafter, the court stated that it had considered each statutory mitigating circumstance and any additional mitigating circumstance offered by Hallford or evident from the evidence in the case. Then, the court enumerated the facts which that court obviously considered as bearing on the weight of the mitigating circumstances. Having done so, the court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Hallford to death.

In its written findings, the trial court did not specify what weight it gave to the jury's verdict nor was it required to do so. *Harris v. Alabama, supra.* But it is painfully obvious that the trial court's decision was not affected in the least by the incest testimony which the law presumes the trial judge knows is relevant only for rebutting Hallford's trial testimony. It is correct that the court mentioned the testimony about the incest but that was done only in the context of identifying the basis of Hallford's jealousy motive for the murder. After a careful review of the record before the court, the court concludes that even if a limiting instruction had been given to the jury, the results of the sentencing proceedings would not have been different.

### (3.) Failure to Investigate and Introduce Mitigation Evidence

Hallford next argues that his counsel was ineffective for failing to investigate further into his background to determine what additional mitigation evidence existed, including whether a mental health evaluation was in order, and for failing to present readily available mitigation evidence at the sentencing hearing about Hallford's abusive upbringing and his ability to function well in prison. Hallford's trial counsel explained at the evidentiary hearing before this court that he looked for potential mitigating evidence but struck out because "[h]e just didn't have the benefit of a client that had a good background." Evid H'rg at 96. Indeed, Kominos was familiar with Hallford and his background because he previously had represented him. R. Ex. P. 92 at 164. Moreover, Kominos testified at the Rule 32

hearing that he interviewed all the witnesses whose names Hallford provided to him. R. Ex. P–92 at 154. Counsel also recognized the threat existed that the state might seek to offer in rebuttal to any evidence of Hallford's good deeds, evidence of his sexual abuse of his children and his step children, other than just Melinda. Evid. H'rg. at 285, 371. Accordingly, the Court of Criminal Appeals recognized that Kominos' decision to put only Hallford and his mother on the stand to plead for Hallford's life was a "tactical choice made by counsel" who was familiar with Hallford because of prior representation of him and was made after counsel "considered offering other evidence." *Hallford v. State,* 629 So.2d 6, 10 (Ala. Crim.App.1993).

Hallford specifically argues that counsel was ineffective for failing to submit him to a mental evaluation. Kominos, however, testified based upon his familiarity with Hallford, he was unaware of anything in Hallford's background that would have warranted court approval of a mental evaluation. R. Ex. P–92 at 164.

Hallford also argues that trial counsel was ineffective for failing to put on evidence of his good behavior in prison. However, counsel recognized that any testimony about Hallford's good conduct in prison would have opened the door to testimony by the state's psychologist that Hallford bragged to him that while he was in the federal penitentiary he was making a lot of money taking GED tests for other inmates. Evid. H'rg. at 374.

Hallford argues that trial counsel was ineffective for failing to put on evidence of his abusive upbringing. Indeed, Kominos did not investigate whether Hallford had been abused as a child because he was 39 years old when he committed this crime. Kominos testified "Philip was an adult and he had been in prison before and I just didn't feel that I would be effective in front of a jury talking about how unfortunate things were when he was a child." Evid. H'rg. at 101. The Eleventh Circuit has affirmed the reasonableness of such a strategic decision stating that evidence of childhood abuse is of minimal value when the defendant is an adult. *See Bolender v. Singletary,* 16 F.3d 1547 (11th Cir. 1994). Thus, after a careful consideration of the evidence and counsel's actions, the court can not say that no competent attorney would have decided to limit the mitigation evidence presented at the sentencing hearing. *Kelly,* 820 F.2d at 1176. Accordingly, the court concludes that because Hallford fails to demonstrate that his attorney's performance "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, this ineffectiveness claim lacks merit.

**B. Conviction Based on Legally Insufficient Evidence**

Hallford claims that he was convicted of capital murder on the basis of legally insufficient evidence in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Hallford claims that his conviction and death sentence for capital murder-robbery is unconstitutional because of the absence of evidence sufficient to support a conclusion beyond a reasonable doubt that the murder occurred during a robbery. In evaluating the sufficiency of the evidence supporting a criminal conviction, "the relevant question is whether, after reviewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does

not affirmatively appear in the record— that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct. 2781. Under Alabama law, a conviction for capital murder-robbery cannot be sustained unless the State proved beyond a reasonable doubt that the murder was committed during the robbery, i.e. that the murder was committed "in the course of or in connection with the commission of, or in immediate flight from the commission of" the robbery. *Connolly v. State,* 500 So.2d 57, 62 (citing ALA. CODE § 13A–5–39(2)). Resolution of this issue requires repetition of some facts.

Melinda Hallford and Sammy Robbins were present when Hallford ambushed and then shot and killed Shannon. On April 12, 1986, Melinda, Sammy and Hallford were driving around Daleville in Hallford's car. Ex. P–2 at 462. Around midnight Hallford had Melinda telephone Shannon and ask him to meet her at the abandoned bridge. *Id.* at 464. Melinda and Shannon were dating each other, and when Melinda asked Hallford why he ordered her to call the victim, Hallford replied that he wanted to talk to him. *Id.* at 466. At the abandoned bridge, Hallford told Melinda to take the driver's seat and to press the brake pedal so that the victim could see the brake lights. *Id.* at 471. Hallford told Sammy to crouch behind the car's right front fender as he stood in the darkness grasping the pistol and waited for Shannon's arrival. *Id.* at 281. Shortly thereafter Shannon ran up to the car. *Id.* at 472.

After Shannon said a few words to Melinda, Hallford jumped out of the darkness and pinned the victim to the car, placed the pistol's muzzle in Shannon's mouth and fired. *Id.* at 472, 282–283. Shannon collapsed to the ground, wounded but still alive. *Id.* at 283, 472, 474. Hallford seized Shannon's leg and dragged him down a trail towards the old bridge. *Id.* at 283,

286, 287. Hallford, at first, ordered Sammy to accompany him but later ordered him back to the car. *Id.* at 285.

Holding Shannon's hair, Hallford marched him toward the bridge. *Id.* at 285. On the bridge, Hallford fired two more shots into Shannon's head and then dumped the body into the river. Melinda and Sammy heard the two gun shots, seconds apart, as they waited for Hallford's return. *Id.* at 287. Hallford returned to the car and they drove away from the abandoned bridge to the new bridge to be sure no one was there who might have heard the gun shots and then they drove to Hallford's trailer. *Id.* at 289. Hallford and Sammy returned to the abandoned bridge to clean the puddles of blood and to check to be sure the body was not floating in the river. *Id.* at 290, 295.

Around 11:30 a.m. the morning following the murder, Sammy saw Hallford, with Melinda beside him, holding a wallet and tossing it and its contents into a fire. *Id.* at 297. Melinda recognized the wallet as belonging to the victim. *Id.* at 478. Hallford told her that the victim was a cheapskate because he was not carrying any money in the wallet. *Id.* at 478. Several days later, Hallford's step-children saw Hallford melt the murder weapon, a .22 caliber pistol. *Id.* at 511, 527.

From this testimony, the Court of Criminal Appeals concluded as follows:

> ... we find that the jury could have reasonably inferred from the circumstances that appellant planned to kill the victim and cover up his crime by disposing of the body in such a way that it was unlikely to be found, and if found, difficult to identify. The jury could have further reasonably inferred from the evidence, that in carrying out this plan, appellant stole the victim's wallet and shoved the victim into the river; that the taking of the wallet was a part of the

overall plan or scheme; and that appellant's intent to do so was formed prior to the actual killing. The evidence offered the additional reasonable inference that, from the appellant's use of the term "cheapskate" when commenting on his alleged failure to find any money in the victim's wallet, he was partially motivated by the desire for pecuniary gain. The site selected by appellant for the commission of the crime, the use of his daughter to lure the victim to the site, his efforts to dispose of the incriminating evidence, his checking to see if the body had floated to the surface, and the burning of the wallet with the victim's identification are facts from which the jury could have reasonably concluded that the murder and robbery were planned in advance and that appellant intended to steal the victim's wallet and identification at the time the killing took place. Thus, the state's evidence supported the conclusion that the robbery began when the attack took place and was consummated when appellant took the wallet.

*Hallford*, 548 So.2d at 536.

■ Hallford argues that only circumstantial evidence of the burning of the wallet the day following the murder established the fact of the robbery, and the fact that Hallford dragged the victim toward the river after shooting him left open the possibility that the wallet fell from the victim's pocket and was later discovered by Hallford, and as an afterthought, was disposed of to prevent identification of the victim. This speculation by the petitioner does offer an alternative interpretation of the facts which, if the jury had found it to

be a plausible explanation of the events surrounding the crime, could have influenced the jury to conclude that the robbery component of the crime did not exist. However, making this inference from the facts as the petitioner suggests conflicts with the jury's ultimate conclusion, which is supported by the testimony recounted above, that Hallford committed the capital crime of murder during the course of a robbery. Under existing law the court is not allowed to adopt such a conflicting interpretation of the facts, but is bound to conclude that the jury "resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326, 99 S.Ct. 2781. Accordingly, the court concludes that after reviewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319, 99 S.Ct. 2781. Thus no habeas relief is due as to this claim.

**C. Death Sentence Based on Legally Insufficient Evidence**

■ Hallford claims that his death sentence is unconstitutional because the evidence was insufficient to support the application of the "especially heinous, atrocious or cruel" aggravating circumstance.[29] Alabama law allows the death penalty to be imposed for a crime which is "especially heinous, atrocious, or cruel compared to other capital offenses." ALA. CODE § 13A–5–49(8). Hallford first argues that because no evidence of the facts surrounding "other capital offenses" was offered at his trial the jury and trial court were not able

---

**29.** There is a dispute between the parties as to whether this claim is appropriately before the court for merit review. In the Recommendation, the Magistrate Judge concluded that the claim was procedurally defaulted, but that because petitioner had alleged ineffectiveness of counsel as cause for the default, the court

could evaluate this claim if cause were established. *See* Recommendation at 19–20. Later, the District Judge, albeit with no discussion, ordered that this claim be considered on the merits. *See* Memorandum Opinion and Order at 21. Accordingly, this court will consider this claim on the merits at this time.

to perform the comparative function required by the language of the statute. However, Hallford offers no case law, and indeed the court is aware of none, which mandates the admission and consideration of this type of comparative "other capital case" evidence in order for this aggravating factor to be established. Rather Alabama courts have focused on the torture of the victim in the specific case before it and have held that in order for the heinous, atrocious or cruel aggravating factor to be established, the evidence must demonstrate that the crime committed was a "conscienceless or pitiless homicide[ ] which . . . [was] unnecessarily torturous to the victim." *Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir.1989) citing *Ex parte Kyzer*, 399 So.2d 330, 334 (Ala.1981).

The Alabama Court of Criminal Appeals recounted the facts of the crime as follows:

[t]he state's evidence at the guilt phase of [Hallford's] trial tended to show that in the early morning of April 13, 1986, [Hallford] forced his daughter to entice her boyfriend, Charles Eddie Shannon to a secluded bridge. He then shot Shannon once in the roof of the mouth. While Shannon was still alive, [Hallford] dragged him to the side of the bridge and shot him two more times, once in the front of the left ear and once in the forehead. [Hallford] then threw the body over the bridge railing and into the water.

*Hallford*, 629 So.2d at 7. The facts as stated by the Alabama Court of Criminal Appeals were supported by the testimony at trial of Sammy Robbins and Melinda Hallford, both who were present during the shooting. Indeed, Melinda and Sammy testified that after the victim ran up to the car and spoke a few words to Melinda, Hallford jumped out of the darkness and pinned the victim to the car, placed the pistol's muzzle in the victim's mouth and fired. R. Ex. P–2 at 282–283 and 472.

The victim collapsed to the ground, wounded but still alive. After the shooting, both witnesses heard the victim say several words. *Id.* at 283, 472, 474. Hallford seized the victim's leg and dragged him down a trail towards the old bridge. *Id.* at 283, 286, 287. Sammy heard the victim mumbling while Hallford was dragging him. Sammy, at Hallford's order, accompanied Hallford and the victim about half way to the bridge, but then Hallford ordered him to return to the car. *Id.* at 285. At some point during first half of the walk to the bridge, the victim was on his feet with Hallford holding him by the hair. In this way, Hallford marched the victim toward the bridge. *Id.* at 285. On the bridge, Hallford fired two more shots into the victim's head and then dumped the body into the river. Approximately five minutes later, Melinda and Sammy heard the two gun shots, seconds apart as they waited for Hallford's return. *Id.* at 283–84, 288, 474–476.

The petitioner argues that there is no evidence to support the trial court's findings that the victim remained conscious until the final shots were fired; thus the crime does not fall within that class of crimes found to be "unnecessarily torturous" to the victim. Specifically, Hallford argues that the testimony of Sammy and Melinda fails to demonstrate that the victim remained conscious until the final two shots were fired and the state's own forensic evidence offered no opinion regarding the time between the first shot and the time the victim lost consciousness. Ex. P–2 at 309–23. Rather the expert conceded that the likely effect of any of the shots would be "instant incapacitation." *Id.* at 317–21.

The court is not free to substitute its or Hallford's judgment about the evidence. In his order imposing the sentence of death, the trial judge found that after Hallford shot Shannon, he "dragged or pulled the pleading victim . . ." Some evi-

dence supports this conclusion. Based on the evidence, the Alabama Supreme Court found Hallford's "conduct to be conscienceless, pitiless, and unnecessarily torturous to the victim." *Hallford v. State,* 548 So.2d 526, 543 (Ala.1988). Indeed, the court stated that it had "weighed this evidence in the light of the limitations placed upon the construction of this aggravating circumstance and conclude that it satisfies the requirements of *Kyzer.*" *Id.* The state court's finding of the existence of the heinous, atrocious and cruel aggravating circumstance is "fairly supported by the record," *see, Johnson,* 256 F.3d at 1169, and is not clearly erroneous. *See Bradley v. Nagle,* 212 F.3d 559 (11th Cir.2000) (Explanation by the state court concerning HAC must show court did not subvert the narrowing function of the factor by obscuring the boundaries of cases to which the factor applies). The court concludes that petitioner's claim that his death sentence is based on legally insufficient evidence fails. Accordingly, no habeas relief is due on this claim.[30]

D. Admission of Incest Evidence at the Penalty Phase

 Hallford claims that his Eighth and Fourteenth Amendment rights were violated by the admission of Melinda Hallford's testimony about their incestuous relationship during the penalty phase. More specifically, he claims that admission of the incest testimony during the penalty phase violated his rights to due process and his right to protection from arbitrary imposition of the death penalty. As already explained, the Alabama Court of Criminal Appeals held that the incest testimony was admissible for the purpose of rebutting

testimony by Hallford during the guilt phase "portray[ing] him as a good father and, therefore, a person of good character." *Hallford,* 548 So.2d at 537, 544 (citing ALA. CODE § 13A–5–45(c)). Hallford argues that "[t]his ruling is not only erroneous as a matter of state law, but also fundamentally unfair as a matter of federal constitutional law." Habeas relief on a claim requesting review of a state court evidentiary ruling may only be granted if the ruling "was of such magnitude as to deny fundamental fairness." *Baxter v. Thomas,* 45 F.3d 1501, 1509 (11th Cir. 1995).

Pursuant to ALA. CODE § 13A–5–52, the jury could consider any aspect of Hallford's character or his record as evidence of a mitigating circumstance. Furthermore, pursuant to ALA. CODE § 13A–5–45(c), the jury could consider Hallford's guilt phase testimony that he was a "good father", as described above, in reaching its sentencing verdict. Thus, evidence which tended to rebut Hallford's testimony that he was a good father was both "relevant and of probative value in the sentencing aspect of the trial." *Hallford, supra.* Therefore, the court concludes that the state court evidentiary ruling did not deny him "fundamental fairness." Thus, habeas relief is due to be denied as to this claim.

E. The Trial Court's Jury Instruction on the "Especially Heinous, Atrocious or Cruel" Aggravating Circumstance Violated the Eighth and Fourteenth Amendments Because it was Unduly Vague *as Applied* to this Case.

 Hallford claims that the trial court's jury instruction on the especially

---

**30.** Petitioner also cursorily argues in footnote 53 that trial counsel was ineffective for failing to challenge the State's failure to present evidence of comparable capital cases and for failing to introduce any evidence regarding the application of the "heinous, atrocious or cruel" aggravating circumstance in comparable capital cases. However, because the court has concluded that the underlying claim lacks merit, the court will not dwell on these claims. Indeed, there can be no showing of ineffectiveness or resulting prejudice as required by *Strickland* for counsel's failure to pursue a meritless claim.

heinous, atrocious, or cruel aggravating circumstance violated the Eighth and Fourteenth amendments because it was unduly vague such that the jury could have understood the instruction to permit the consideration of the incest testimony in determining whether Shannon's murder was "especially heinous, atrocious or cruel."[31] To the extent that an aggravating circumstance, as defined in a death penalty statute, provides insufficient guidance, it must be accompanied by narrowing language that provides a "principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey v. Georgia*, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

> [An] aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. *See Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm"). Second, the aggravating circumstance may not be unconstitutionally vague. *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–1765, 64 L.Ed.2d 398 (1980); *see Arave, supra*, 507 U.S. at 471, 113 S.Ct. at 1541 (court " 'must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer' ") (*quoting Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057–3058, 111 L.Ed.2d 511 (1990)).

*Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

■ The underlying constitutional concern is to prevent the arbitrary imposition of the death penalty. The Eleventh Circuit has held that the constitutionality of the "especially heinous, atrocious or cruel" aggravating circumstance in Alabama is dependent upon a jury instruction which makes clear that a murder cannot be found to be especially heinous, atrocious or cruel unless *the murder itself* was a "conscienceless or pitiless homicide [ ]... unnecessarily torturous to the victim." *Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir. 1989). In reviewing a state court jury instruction challenged as ambiguous, the relevant inquiry on habeas review is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). The touchstone is whether an instruction violates fundamental fairness. *See id.* at 75, 112 S.Ct. 475.

■ In support of his position, the petitioner points to the court's specific instructions on the "especially heinous, atrocious or cruel" aggravating factor and to the general instructions about aggravating and mitigating circumstances. The court has reviewed the trial court's specific instructions to the jury on the heinous, atrocious, or cruel aggravating factor in the context of the jury charges as a whole. *See Bogle v. McClure*, 332 F.3d 1347, 1357 (11th Cir.2003) (Court is to examine "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and

---

**31.** The respondent argues that this claim is procedurally defaulted. Because the court concludes the claim lacks merit, the court pretermits consideration of the default. *United States v. Nyhuis*, 8 F.3d 731, 744 (11th Cir.1993).

were not misled.") The court concludes that the specific instructions given on the heinous, atrocious or cruel aggravating factor, for the most part, clearly focused the jury's attention on the "actual commission" of the crime and whether the crime was "unnecessarily tortuous to the victim." R. Ex. P–9 at 730. Arguably, there was some narrow language which might have been interpreted by the jury to direct its attention to acts outside the scope of the actual commission of the crime. The court instructed the jury

> [w]hat is intended to be included in the aggravating circumstances are those cases where the actual commission of a capital offense *is accompanied by such additional acts* as to set the crime apart from the norm of capital offenses.

*Id.* This language limits the jury's consideration of "additional acts" to acts which accompany the "actual commission" of the crime. The term "accompany" is an ordinary word in reasonably common usuage, and there is not a reasonable likelihood that a juror would believe that it referred to acts not contemporaneous with the "actual commission" of the offense.

Immediately after charging the jury as quoted above, the trial court defined the terms "heinous," "atrocious" and "especially cruel" in a manner which focused on the "brutality" of the offense and whether it was "a consciousless or pitiless crime" "unnecessarily tortuous to the victim." *Id.* This part of the charge focused the jury on the "actual commission" of the crime itself, and was not constitutionally infirm by allowing the jury to improperly consider the incest testimony.

F. The "Especially Heinous, Atrocious, or Cruel" Aggravating Circumstance is Vague on its Face and Arbitrary in Violation of the Eighth and Fourteenth Amendments.

Hallford now argues that application of the "heinous, atrocious or cruel" aggrava-

ting factor to his case is *on its face* unconstitutional. As the court understands this facial claim, petitioner asks the court to strike down Alabama law as to the proper use of the "heinous, atrocious, or cruel" aggravating factor as stated in *Ex parte Kyzer,* 399 So.2d 330 (Ala.1981), the constitutionality of which was affirmed by *Lindsey v. Thigpen,* 875 F.2d 1509 (11th Cir. 1989). Petitioner recognizes that the Eleventh Circuit's decision in *Lindsey,* 875 F.2d at 1512–1514, forecloses this argument, and he brings it solely to preserve it for appellate review, relying principally upon *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) and *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), both of which predate *Lindsey.* Hallford does not cite the court to any intervening Supreme Court or Eleventh Circuit *en banc* opinion which overrules or casts doubt on *Lindsey* which, therefore, controls. Thus, the court concludes that this argument lacks merit and that no habeas relief is due on this claim.

G. Fourteenth Amendment Challenge to the Trial Court's Failure to Give Limiting Instructions Regarding the Jury's Consideration of Hallford's Prior Criminal Convictions.

The Petitioner argues that during the guilt phase of his trial the prosecution introduced evidence of his prior convictions, solely for the purpose of impeaching his credibility, but that the trial court failed to instruct the jury that its consideration of this evidence should be limited to the issue of Hallford's credibility. The Petitioner argues that this failure violated his Fourteenth Amendment rights because there is a reasonable likelihood that the jury improperly considered Hallford's prior convictions as substantive evidence of his propensity to commit the murder with which he was charged. This claim lacks

merit because the evidence of Hallford's guilt in this case was overwhelming. Accordingly, the court concludes that no habeas relief is due on this claim.

H. Eighth and Fourteenth Amendment Challenges to the Trial Court's Erroneous Instruction on Intent

 Hallford argues that the trial court gave an erroneous jury instruction on intent, which violated his constitutional rights, because the trial judge did not adequately define the term "intent" in the context of the charge on first degree robbery and the trial judge failed to provide the jury with meaningful guidance regarding the requirement that the intent to rob be contemporaneous with the murder. *See Connolly v. State,* 500 So.2d at 62 (Ala. Crim.App.1985). Hallford claims that given the trial court's allegedly inadequate and confusing instructions, it is at least reasonably likely that the jury convicted Hallford of capital robbery-murder without being convinced beyond a reasonable doubt of the requisite contemporaneous specific intent to kill and rob.

With respect to robbery in the first degree, the court charged the jury as follows:

A defendant commits the crime of robbery in the first degree if he uses or threatens to use a[sic] force against the owner of personal property or any persons present while in the course of committing a theft of personal property with the *intent* to overcome the victims physical power of resistance in order to compel the victim's acquiescence in the taking of the personal property, and in the course of said theft or the taking of the personal property, or the attempt thereof, the Defendant *intentionally* causes serious physical injury or death to a person, or is armed with a deadly weapon or dangerous instrument.

R. Ex. P–4 at 678–679 (emphasis added). The court concludes that the trial judge clearly instructed the jury that robbery

requires the finding of both the intent to deprive the victim of his property and the intent to overcome the victim's resistance through the use of force. Thus, the court concludes that the Petitioner's claim involving the trial court's intent instructions in the context of robbery in the first degree lack merit.

With respect to the charge explaining the requirement that the intent to rob be contemporaneous with the murder, the court charged the jury as follows:

The fact that someone dies or is killed during the course of a robbery does not automatically provide that intent. The intent to kill must be real and specific in order to invoke the capital statute. To be a capital offense, the murder of the intentional killing type must have been committed during the robbery in the first degree. "During" means in the course of or in connection with or immediate flight therefrom with the commission of robbery in the first degree. An accused is not guilty of a capital robbery murder where the intent to rob was formed only after the victim was killed. To sustain a conviction under the Alabama Statute for capital murder robbery, the State must prove, beyond a reasonable doubt, a robbery in the first degree or an attempt thereof as I have just defined it, and intentional murder or killing as I have just defined it, and that the murder was committed during the robbery or attempted robbery and that the murder was committed in the course of or in connection with the commission of or the immediate flight from the commission of the robbery or the attempted robbery in the first degree.

\* \* \* \* \* \*

Although a robbery committed as a mere afterthought, and unrelated to the murder will not sustain a conviction for the capital offense of murder robbery,

the question of the Defendant's intent at the time of the commission of the crime is an issue for the jury to decide. So, it's an issue for you to decide what the Defendant's intent was at the time of the commission of the crime, if you found that the Defendant is guilty of the crime.

If you are reasonably satisfied from the evidence, beyond a reasonable doubt, that at or during the time that the attempt—that at or during the time that the offense was being committed; that is, at or during the time that the intentional type killing as I have defined it was being committed, that the Defendant had formed the intent to kill Charles Edward Shannon and dispose of his body and to take the wallet so that the body could not be easily identified, if you found that all of that happened at one time, and you believe it beyond a reasonable doubt, then you could find the Defendant guilty of a capital offense.

On the other hand, if you're not convinced by the evidence beyond a reasonable doubt that the Defendant committed the crime of murder of the intentional killing type of Charles Shannon by the means alleged in the indictment, or if you're not convinced by the evidence beyond a reasonable doubt that the said murder of intentional killing was committed during a robbery in the first degree as previously defined, and was committed by the Defendant, then the Defendant could not be convicted of a capital offense charged in the indictment. The burden is upon the jury—if you found that the Defendant committed the killing, the burden would be upon the jury—it would be a question of fact for the jury to decide as to whether or not at the time the killing took place, whether or not the Defendant intended at that time to dispose of the body and to take the wallet or steal the wallet so that the body could not be identified. If you found all of that, then you could find the—and you found it beyond a reasonable doubt from the evidence in the case, then you could find the Defendant guilty of the capital offense of capital murder robbery.

On the other hand, if you're not convinced by the evidence, beyond a reasonable doubt, that the Defendant committed a crime of murder of the intentional killing type of Charles Edward Shannon, by the means alleged in the indictment, or if you're not convinced by the evidence beyond a reasonable doubt that said murder of the intentional killing type was committed during a robbery in the first degree, as I have defined it, and was committed by the Defendant, then the Defendant could not be guilty of a capital offense. So in order to find the Defendant guilty of a capital offense, you have to find there was an intentional killing of Charles Edward Shannon as I have defined it to you, and that would be murder, and that it was committed while the Defendant was—was committing robbery in the first degree on the victim.

R. Ex. P–4 at 682–687. These instructions adequately and thoroughly explain to the jury their responsibility. Accordingly, the court concludes that this claim lacks merit and that no habeas relief is due on this claim.

I. Eighth and Fourteenth Amendment Challenges to the Trial Court's Erroneous Instruction on Reasonable Doubt

▮▮ Hallford argues that his constitutional rights were violated because the trial court gave an erroneous instruction on reasonable doubt which lowered the government's burden below proof beyond a reasonable doubt. Specifically, he claims that the instruction was deficient for three reasons: (1) "reasonable doubt" was equ-

ated with "moral certainty"; (2) the jury was told it must have a "good reason" to support a reasonable doubt; and (3) part of the instruction could have confused the jury in saying a reasonable doubt does not necessarily mean an absolute certainty and that "justice is, after all, but an approximate science." The Due Process Clause of the Fourteenth Amendment requires a state to prove beyond a reasonable doubt every element of the offense with which a criminal defendant is charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). When reviewing the correctness of reasonable doubt instructions, the Supreme Court has stated the appropriate inquiry is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor v. Nebraska,* 511 U.S. 1, 6, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).

At the close of the evidence at Hallford's trial, the judge gave the jury the following instruction on reasonable doubt:

In this case as in all other cases where the Defendant pleads not guilty, the burden of proof is upon the State to convince each member of the jury that the Defendant is guilty, beyond a reasonable doubt, and further, to convince each member of the jury that the truth of the material averments contained in the indictment have been proven beyond a reasonable doubt

The term "reasonable doubt" means a doubt which has some good reason for its arising out of the evidence in the case. Such a doubt as you're able to find in the evidence a reason for. It means an actual and substantial doubt growing out of the unsatisfactory nature of the evidence in the case. It does not mean a doubt which arises from some mere whim or from any groundless surmise or guess. While the law requires you to be satisfied of the Defendant's guilt beyond a reasonable doubt, it at the same time prohibits you from going outside of the evidence to hunt up doubts upon which to acquit the Defendant. In arriving at your verdict, it is your duty to carefully consider the entire evidence in the case, and in so doing, you should entertain such doubts only as arise from the evidence and are reasonable. Unless the doubt is a reasonable one and does so arise, it would not be sufficient in law to authorize a verdict of not guilty.

A reasonable doubt is a fair doubt based upon a reason and common sense and—in arising from the state of the evidence. While it is rarely possible to prove anything to an absolute certainty, suspicion or conjecture, a reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence. The burden is upon the State to prove the Defendant guilty beyond a reasonable doubt of every essential element of the crimes charged. A Defendant has a right to rely upon failure of the prosecution to establish such proof. A Defendant may also rely upon evidence brought out on cross-examination of the witnesses for the prosecution and upon evidence presented on behalf of the Defendant.

The law never imposed upon a Defendant in a criminal case the burden or duty of producing evidence. A reasonable doubt exist[s] in any case when after a careful and impartial consideration of all the evidence in the case, the juror[ ]s do not feel convinced to a moral certainty that the Defendant is guilty of the charge.

If upon a careful review of all the evidence in the case you ask your inward conscience, "Is he the guilty one? Did he do what he is charged with doing?", and the answer is, "I have no doubt about it," then you should convict.

But if the answer is, "I doubt if he is. I doubt if he did," then you should acquit. So, by a "reasonable doubt" is not meant absolute certainty. There is no such thing as absolute certainty in human affairs, for justice is, after all, but an approximate science and its ends are not to be defeated by a failure of strict and mathematical proof.

\* \* \* \* \* \*

Upon circumstantial evidence, there should not be a conviction unless to a moral certainty it excludes every other reasonable hypothesis than that of the guilt of the Defendant. No matter how strong may be the circumstances, if they can be reconciled to the theory that someone other than the Defendant may have done the act, o[r] that the Defendant did not do the act, then the guilt of the Defendant is not shown in a full measure of proof that the law requires.

\* \* \* \* \* \*

The Court charges the jury that in order to return a verdict of not guilty, it is not necessary that you actually find the Defendant not guilty. It is sufficient if the State has failed to meet its burden of proving beyond a reasonable doubt and to a moral certainty every element of the offense and that the Defendant has committed the offense. If the proof falls short of this, then it would be your duty to find the Defendant not guilty whether you actually believed him to be guilty or not.

R. Ex. P–4 at 674–676, 695, 702–703.

■■■ Hallford claims that the trial court's instruction violated *Cage v. Louisiana*, 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) because the instruction equated "reasonable doubt" with "moral certainty." [32] In *Cage*, the Supreme Court held that an instruction that equated "rea-

sonable doubt" with "grave uncertainty," and "actual substantial doubt" and stated that what was required to convict was a "moral certainty", could have led a reasonable juror to interpret the instruction to allow a finding of guilt based on a lesser degree of proof than that required by the due process clause. *Cage*, 498 U.S. at 40, 111 S.Ct. 328. The Court noted that "[i]t is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Id.* at 41, 111 S.Ct. 328. While the jury instruction here on one occasion equates "reasonable doubt" with a "moral certainty," it does so solely within the context of explaining how to consider whether a conviction is proper based on circumstantial evidence, and it does not contain the other infirmities which form the basis for the ruling in *Cage*.

The Eleventh Circuit has concluded that this type of instruction could not be understood to lower the State's burden as long as clarifying language is used. *See Felker v. Turpin*, 83 F.3d 1303, 1309 (11th Cir. 1996) (trial court's definition of reasonable doubt as "doubt which is based on the evidence, a lack of evidence or a conflict in the evidence" and "doubt which is reasonably entertained as opposed to vague or fanciful or farfetched doubt," clarifies any confusion caused by equating "reasonable doubt" with "moral certainty"); *Harvell v. Nagle*, 58 F.3d 1541, 1543 (11th Cir.1995) (trial court stated that reasonable doubt had to be derived from the evidence and that reasonable doubt could not be "fanciful, vague, whimsical, capricious, conjectural or speculative" clarifies any confusion caused by the term "moral certainty"). The instruction in this case has the same

---

**32.** In pre-AEDPA cases, *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339

(1990) is retroactively applicable. *Nutter v. White,* 39 F.3d 1154 (11th Cir.1994).

clarifying language used by the trial courts in *Felker* and *Harvell*. As the instruction restated above demonstrates, the trial judge repeatedly instructed the jury that it could not convict Hallford unless the evidence presented to it was inconsistent with any reasonable theory of innocence. Moreover, the instruction, considered as a whole, emphasized the jury's obligation to focus on the evidence presented in court. Thus, the court concludes that it is not reasonably likely that because the trial judge equated "reasonable doubt" with "moral certainty" on a single occasion that the jury misunderstood the instructions to allow for a conviction on proof insufficient to meet the *Winship* standard.

For these same reasons, the court also concludes that Hallford's argument that it is unconstitutional to say a "reasonable doubt" means a doubt which has some "good reason" lacks merit. In the same sentence, the trial judge instructed the jury this "good reason" must arise from the evidence in the case. Thus, considering the instructions as a whole, there is no doubt that the jury was correctly informed about the prosecution's burden of proof by anchoring that burden in the evidence.

Finally, Hallford contends that it was confusing to inform the jury that "by a reasonable doubt is not meant absolute certainty," and that "justice is, after all, but an approximate science." R. Ex. P–4 at 676. Looking at the instructions as a whole, the court concludes that there is not a reasonable likelihood that the jury took them to mean that the State's burden of proof should be lowered. Indeed, the trial judge actually raised the State's burden by telling the jury that the State had to prove guilt beyond any doubt. *Id.* at 676. ("Did he do what he is charged with doing? and the answer is, I have no doubt about it, then you should convict.") Moreover, in the next sentence, the trial judge stated that if the jury had *any* doubt that the defendant was guilty, then they should vote not guilty. *Id.* Accordingly, after considering the charge as a whole, the court concludes that this claim lacks merit.

J. Eighth and Fourteenth Amendment Challenges to Other Jury Instructions

Hallford, first, argues that his Constitutional rights were violated by the trial court's failure to give a proper instruction regarding the possibility of parole. Specifically, he claims that when the jury requested clarification from the court about whether Hallford could be released if sentenced to life imprisonment without parole, the judge's response inadvertently suggested that parole remained a possibility. At the sentencing stage the jury asked the court, "Does life without parole mean no way, whatsoever, of a release for even one hour any time during his life until death, or would it have to be life without parole until death one day?" Ex. P–9 at 743–44. The court responded as follows:

It's improper for the Court to answer questions concerning possibl[e][sic] exceptions to the life without parole penalty. You should not concern yourselves with the pardon and parole laws in the State of Alabama. So far as you're concerned, there are two possible verdicts in this case. One of them is life without parole and the other one is death. So far as you're concerned at the sentencing stage, life without parole means life without parole. *That is, it means that the Defendant will remain in prison for the rest of his life, and that's all I can even commit on that question.*

*Id.* at 744 (emphasis added). Far from what Hallford suggests, the court explains that if convicted and sentenced to life without parole, Hallford "will remain in prison for the rest of his life." Accordingly, the court concludes that this claim lacks merit.

Hallford next argues that his counsel was ineffective for failing to object to the

trial court's failure to instruct the jury, in accordance with State law, that it should presume Hallford would spend the rest of his life in prison if it recommended a sentence of life imprisonment without the possibility of parole and for failing to seek a mistrial based on the absence of such an instruction. The court has concluded that the underlying claim lacks merit; indeed, after reviewing the transcript this court has found that the trial court adequately instructed the jury that a sentence of life without parole means that "the Defendant will remain in prison for the rest of his life." *Id.* at 744. Accordingly, because the court concludes that the underlying claim lacks merit, the court now concludes that counsel's failure to object to the trial court's instruction and to seek a mistrial did not fall "below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ Hallford further argues that his Constitutional rights were violated by the trial court's failure to instruct the jury that it should determine whether or not Melinda was an accomplice to the murder of Shannon and that, if it determined she was an accomplice, her testimony could not be used to convict Hallford of capital murder unless it was corroborated by other evidence connecting Hallford with the crime. Under Alabama law the test for whether an accomplice instruction should be given is whether the witness could have been charged with the same offense as the defendant, either as a principal or an accessory. *Ash v. State,* 81 Ala. 76, 1 So. 558 (1887); *Curry v. State,* 502 So.2d 836, 841–842 (Ala.Crim.App.1986).

■ The short legal answer to this claim is that there is no constitutional requirement that the testimony of an accomplice-witness be corroborated. *See e.g. Brown v. Collins,* 937 F.2d 175, 182 n. 12 (5th Cir.1991). Hallford's claim, therefore,

devolves into a claim of sufficiency of the evidence under state law; consequently, his claim is not cognizable in a federal habeas proceeding. *See Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The short factually based answer to this claim is that even if Melinda properly were considered an accomplice, as explained throughout this opinion there was ample evidence corroborating her testimony. Accordingly, the court concludes that this claim lacks merit.

Hallford argues that his counsel was ineffective for failing to request an accomplice instruction. For the reasons explained above, the court has concluded that the substantive accomplice claim lacks merit. Accordingly, the court now concludes that counsel's failure to request an accomplice instruction did not fall "below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, the court concludes that the ineffectiveness claim premised on this claim also lacks merit. No habeas relief is due on this claim.

K. Sixth, Eighth, and Fourteenth Amendment Challenges to Alabama's Statutory Cap on the Compensation Paid to Counsel in Capital Murder Cases.

■ Hallford claims that ALA. CODE § 15–12–21(d), Alabama's statute governing the compensation of attorneys appointed to represent indigent defendants, is unconstitutional. The Rule 32 trial court held an evidentiary hearing where evidence on this claim was presented. The trial court analyzed the evidence and the relevant legal principals and denied this claim. R. Ex. P–96 at 853–856. The Court of Criminal Appeals affirmed the denial. *Hallford,* 629 So.2d at 11–12.

Hallford argues that the compensation cap is unconstitutional as applied to his case because it caused his counsel to per-

form ineffectively. First, neither this court nor any other court has concluded that Hallford's counsel offered ineffective representation. Hallford presents no evidence in support of this claim, and Hallford's trial counsel Bill Kominos testified as follows:

I did my very best in this case. The compensation part does not even enter my mind. It's not even a factor that you even think about, even remotely.

I've never considered compensation on an appointed case to be a factor. Naturally, every lawyer and everybody, I think, in the judicial system would agree that the indigent compensation is locally [sic] lacking. However, it has not affected my representation of a defendant one iota.

R. Ex. P–92 at 152–153. Moreover, Kominos testified that the time submitted on his fee declaration did not reflect all of the time spent by him in preparation for Hallford's trial. R. Ex. P–96 at 855. Thus, the court concludes that statutory compensation did not affect the quality of the representation that Hallford received.

Next Hallford argues that the negative effects of the compensation cap can be seen in the system as a whole. However, claims made against Alabama's compensation statute have been upheld against similar constitutional challenges raised here. *See e.g. Ex parte Grayson*, 479 So.2d 76, 80 (Ala.1985) ("We reaffirm this belief that attorneys appointed to defend capital clients will serve them well, as directed by their consciences and the ethical rules enforced by the state bar association.") Federal courts have also recognized that attorneys are expected to competently represent indigent clients. *See Waters v. Kemp*, 845 F.2d 260, 263 (11th Cir. 1988)("As an officer of the court, a lawyer has a fundamental duty to perform services pro bono for indigents when called upon by the court.") *quoting Powell v.*

*Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)("Attorneys are officers of the court, and are bound to render service when required by such an appointment."). Hallford directs the court to no controlling law which has held that Alabama's compensation scheme is unconstitutional. The essence of Hallford's argument becomes simply that the court ought to presume counsel could not provide constitutionally adequate representation because of the inadequate compensation. While the court may well agree that the compensation provided by Alabama to counsel in death cases is woefully inadequate, that fact is insufficient as a matter of law to overcome the presumption of effectiveness which attends the performance of counsel. *See Strickland, supra.* Thus, the court concludes that no habeas relief is due in this case on this claim.

L. Claim that Counsel was Ineffective for Failing to Obtain a Complete Transcript and for Failing to Challenge on Appeal State's Failure to Provide Hallford a Complete Transcript

 Hallford argues that his constitutional rights were violated by his counsel's failure to obtain a transcript of the opening and closing arguments of counsel and by his counsel's failure to challenge on appeal the state's failure to provide Hallford with a transcript. He further argues that counsel was ineffective because he did not object or pursue on appeal objections to improper remarks made by the prosecutor at trial at least in part because they were not recorded in the transcript. These remarks include the following topics:

— the possibility that Hallford would be released from prison on parole if not sentenced to death;

— the impact of Shannon's death on his family;

— the jury's role in sentencing;

— the prosecutor's personal opinion regarding appropriate punishment;

— the prosecutor's position of authority and experience;

— inflammatory remarks; and

— references to facts not in evidence.

Petr's Brf. at 94–95.

This claim must be reviewed in the context of the law that was in place at the time of Hallford's conviction and sentencing that occurred in March 1987. At that time, ALA. CODE § 12–17–275 governed the duties of court reporters, and provided that the reporter "shall take full stenographic notes of oral testimony and proceedings, *except argument of counsel....*" (emphasis added). *See also Lyons v. State,* 53 Ala.App. 111, 298 So.2d 42 (1974) (court reporter is under no duty to record arguments, and trial court had no authority to mandate such service.) It was not until September 1, 1987, six months after Hallford's trial, that Rule 21, ALA. R. CRIM.P., TEMP. (now Rule 19.4, ALA. R. CRIM. P.) required court reporters in capital cases to take full stenographic notes of the arguments of counsel.

Notwithstanding Alabama law at the time, Hallford's counsel filed a motion requesting transcription of counsel's arguments. The trial court denied counsel's motion, but informed him that he could enter objections and they would be made part of the record. Counsel is not ineffective because the trial court denied his motion. Moreover, since no law required transcription, there was no legitimate basis for raising this issue on appeal. Thus, counsel cannot be ineffective for failing to raise a non-meritorious claim on appeal. *See Card v. Dugger,* 911 F.2d 1494, 1520 (11th Cir.1990).

■ The court will now address Hallford's separate arguments about counsel's failure to object to specific arguments made by the prosecutor. For the reasons already explained, the court concludes Hallford's claim that counsel was ineffective for failing to object to the prosecutor's argument that Hallford would be released from prison on parole if not sentenced to death lacks merit. Indeed, as the court concluded above, the jury was correctly instructed about parole in the context of this death penalty case. Thus, there can be no prejudice resulting from the failure to object because the court correctly instructed the jury on the law.

■ Next, Hallford alleges that counsel should have objected to argument about the impact of Shannon's death on his family. This claim is patently frivolous. There is no constitutional impropriety in a prosecutor's remarks concerning the impact on a victim's family. See *Payne v. Tennessee,* 501 U.S. 808, 828–31, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Duren v. Hopper,* 161 F.3d 655, 662 (11th Cir.1998).

■ Next, Hallford alleges that counsel was ineffective for failing to object when the jury heard comments that its sentencing verdict was a recommendation. This claim is patently without merit. First, this statement is a correct statement of Alabama law as it existed at the time of Hallford's trial. *See* ALA. CODE § 13A–5–46. Of course, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi,* 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). "To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). However, there is no *Caldwell* violation where "the jury was not affirmatively misled re-

garding its role in the sentencing process." *Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). Counsel was not ineffective for not objecting to the jury being correctly informed about their role in the sentencing process.

Next, Hallford alleges that counsel was ineffective for failing to object when the jury heard the prosecutor's personal opinion regarding the appropriate punishment, statements about the prosecutor's position of authority and other inflammatory remarks including references to facts not in evidence. Of course, the difficulty in resolving this claim is that neither the parties nor the court has a transcription of the arguments of counsel. The court has already concluded that counsel was not ineffective because the arguments were not transcribed. Consequently, the court must conclude that this generalized claim is insufficient to warrant habeas relief. *See e.g. Wilson v. United States,* 962 F.2d 996, 998 (11th Cir.1992) (conclusory allegations insufficient).

M. Claim that Counsel was Ineffective for Failing to Challenge Hallford's Sentence as Arbitrary, Capricious and Disproportionate.

▮▮▮ Hallford argues that counsel was ineffective for failing to challenge his death sentence as arbitrary, capricious and disproportionate because it was imposed notwithstanding that others in materially similar circumstances could not receive the death penalty if they used other methods to conceal the identity of a murder victim. The state court found that "the robbery of the billfold was not a mere afterthought but was part of a plan to cover up the crime and the identity of the victim." *Hallford,* 548 So.2d at 545. In support of this argument, Hallford points to other actions designed to prevent identification of the victim, such as burial or disfigurement, which would not carry the penalty of death. *See* ALA. CODE §§ 13A–5–47 and 13A–5–49. However, Alabama law specifically makes murder a "capital offense [if it was] committed while the defendant was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit robbery." ALA. CODE § 13A–5–49(4). Counsel did not act "[un]reasonab[ly] under prevailing professional norms," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, by failing to challenge a death sentence as arbitrary when it was authorized by state law. Moreover, absent a demonstration that a state's capital punishment system is arbitrary and capriciouis, a habeas petitioner does not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." *McCleskey v. Kemp,* 481 U.S. 279, 307–08, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Accordingly, the court concludes that this claim lacks merit.

N. Claim that Counsel was Ineffective for Failing to Object to Inadmissible and Inflammatory Information in Hallford's Pre–Sentence Report.

Hallford claims that trial counsel was ineffective for failing to object to information contained in the pre-sentence report. The Rule 32 court rejected this claim and noted that the sentencing order was based on the evidence presented at trial and not upon any information contained in the presentence report. R. Ex. P–96 at 878–879. The record before the court and the trial judge's imposition of the sentence supports this conclusion. Moreover, trial judges are presumed to know the law and follow it in making their decisions. *See Ex parte Harrell,* 470 So.2d 1309, 1318 (Ala.1985). Hallford fails to demonstrate that he was prejudiced by the contents of the presentence report. Accordingly, the court concludes that this claim lacks merit.

O. *Ring* Claim

■ Hallford argues the rule announced in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 2432, 153 L.Ed.2d 556 (2002) that "[c]apital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment" invalidates key aspects of Alabama's capital sentencing statute, has retroactive application to Hallford, and requires that his death sentence be vacated. Recently, the United States Supreme Court in *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) held that *Ring* announced a procedural rather than a substantive rule of law, and, therefore it had no retroactive application to death penalty cases already final on direct review. Because at the time *Ring* was announced, Hallford's case was final, he is entitled to no *Ring* relief.

## V. *CONCLUSION*

For the reasons discussed, the court concludes that Hallford's petition is due to be denied.

A separate Final Judgment will be entered in accordance with this Memorandum Opinion.

### FINAL JUDGMENT

In accordance with the memorandum opinion entered contemporaneously with this order, it is ORDERED and ADJUDGED that the petition for the writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be and is hereby DENIED. It is further

ORDERED that the cost of this proceeding be taxed against the petitioner.